**UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, THE DISTRICT OF COLUMBIA, THE STATES OF FLORIDA, CALIFORNIA, COLORADO, GEORGIA, INDIANA, LOUISIANA, NEVADA, OKLAHOMA, TENNESSEE, TEXAS and VIRGINIA, ex rel. KELLY OXENDINE, | Civil Action No. 2:13-cv-3042-PMD |
| Plaintiff(s)/Relator, v. | |
| HCA HOLDINGS, INC. f/d/b/a HCA, INC. f/d/b/a HCA – HOSPITAL CORPORATION OF AMERICA f/d/b/a HOSPITAL CORPORATION OF AMERICA, and PARALLON BUSINESS SOLUTIONS, LLC. | **FILED IN CAMERA UNDER SEAL PLAINTIFF'S ORIGINAL COMPLAINT PURSUANT TO 31 U.S.C. § 3730(B)(2), FEDERAL FALSE CLAIMS ACT AND RELATED STATE ACTS** |
| Defendants. | |

**QUI TAM COMPLAINT AND JURY DEMAND**

# TABLE OF CONTENTS

I. INTRODUCTION. ................................................................................................... 1

II. JURISDICTION AND VENUE. ............................................................................. 4

III. PARTIES. ............................................................................................................... 6

  A. Plaintiff/Relator Kelly Oxendine. ..................................................................... 6

  B. Defendant HCA Holdings, Inc. .......................................................................... 7

  C. Defendant Parallon Business Solutions, LLC. ................................................... 9

  D. Government Plaintiffs. ...................................................................................... 12

IV. DEFENDANTS' VIOLATIONS OF THE FALSE CLAIMS ACT & THE STATE QUI TAM STATUTES.................................................................................................. 13

  A. Background. ...................................................................................................... 13

    1. The HCA Revenue Integrity Department and Creation of Parallon. ............. 13

    2. Defendants' Billing Error Review Process. ................................................... 15

    3. Defendants' Billing Review Process is Deficient and Disguises Their Overbilling Schemes. .................................................................................................... 18

      a. Defendants Incentivize Insufficient and Cursory Reviews. ...................... 19

      b. Defendants Incentivize Unbundling and Double Billing. .......................... 19

      c. Defendants Improperly Restrict Their Audits and Reviews of Billing. ..................... 22

      d. Defendants Do Not Enforce Training Requirements. ................................. 24

  B. Examples of Defendants' Overbilling, Failure to Audit, and Failure to Remit Overpayments.................................................................................................... 24

    1. Example No. 1: Stacking of IV Services....................................................... 25

      a. Realtor's Discovery of Wide-Spread Stacking by Defendants. ................ 26

      b. Defendants Knowingly Overbilled the Government by Stacking and Failed to Take Corrective Action................................................................................. 27

    2. Example No. 2: Overbilling of Obstetric Services......................................... 28

      a. Defendants Knowingly Double Billed the Government and Failed to Take Corrective Action................................................................................. 30

    3. Example No. 3: Overbilling of Fluoroscopy Services. .................................. 31

      a. Defendants Knowingly Double Billed the Government for Fluoroscopy Services and Failed to Take Sufficient Corrective Action..................................................... 32

    4. Example No. 4: Overbilling for Ventilation Set Ups..................................... 33

a.  Defendants Double Billed for Emergency Room and Operating Room Ventilation Set Ups. .................................................................................................................... 33

b.  Defendants Double Billed for Subsequent Day Ventilation Management. ................ 34

c.  Defendants Knowingly Double Billed the Government and Failed to Take Sufficient Corrective Action. ............................................................................................... 35

5.  Example No. 5: Overbilling Related to Infusion Stop Times. ....................................... 36

a.  Defendants knowingly Overbilled the Government for Improperly Documented Stop Times and Failed to Take Sufficient Corrective Action. ................................................... 37

6.  Example No. 6: Performing and Billing for Cholesterol Testing not Ordered by a Physician. .................................................................................................................... 40

V.      BACKGROUND OF THE REGULATORY FRAMEWORK. ....................................... 44

A.  The Federal Medicare Program. ...................................................................................... 44

B.  The Federal & State Medicaid Program. ......................................................................... 50

C.  The Department of Defense TRICARE Program. ........................................................... 51

VI.      APPLICATION OF THE FEDERAL FALSE CLAIMS ACT AND THE QUI TAM STATE STATUTES. .................................................................................................................... 52

VII.     DAMAGES, DISGORGEMENT & REPAYMENT. ...................................................... 55

VIII.    THE CAUSES OF ACTION ........................................................................................... 56

COUNT I: VIOLATION OF THE FEDERAL FALSE CLAIMS ACT (31 U.S.C. § 3729(a)(1); 31 U.S.C. § 3729(a)(1)(A)). ................................................................................. 56

COUNT II: VIOLATION OF THE FEDERAL FALSE CLAIMS ACT (31 U.S.C. § 3729(a)(2); 31 U.S.C. § 3729(a)(1)(B)). ................................................................................. 56

COUNT III: VIOLATION OF THE FEDERAL FALSE CLAIMS ACT (31 U.S.C. § 3729(a)(7); 31 U.S.C. § 3729(a)(1)(G)). ................................................................................. 57

COUNT IV: VIOLATION OF FLORIDA FALSE CLAIMS ACT (Fla. Stat. §68.083 et seq.). .................................................................................................................................... 58

COUNT V: VIOLATION OF CALIFORNIA FALSE CLAIMS ACT (Cal. Gov. §12651 et seq.). .................................................................................................................................... 59

COUNT VI: VIOLATION OF COLORADO MEDICAID FALSE CLAIMS ACT (Colo. Rev. Stat. §25.5-4-305 et seq.). ................................................................................................. 60

COUNT VII: VIOLATION OF DISTRICT OF COLUMBIA FALSE CLAIMS ACT (D.C. Code § 2-308 et seq.). ................................................................................................................ 62

COUNT VIII: VIOLATION OF GEORGIA STATE FALSE MEDICAID CLAIMS ACT (Georgia Code, Title 49, Ch. 4, Art. 168 et seq.). ...................................................................... 63

COUNT IX: VIOLATION OF INDIANA FALSE CLAIMS & WHISTLE-BLOWER PROTECTION ACT ........................................................................................... 64

COUNT X: VIOLATION OF LOUISIANA MEDICAL ASSISTANCE PROGRAMS INTEGRITY LAW (La. Rev. Stat. § 46:438.3 et seq.). ......................................... 65

COUNT XI: VIOLATION OF NEVADA SUBMISSION OF FALSE CLAIMS TO STATE OR LOCAL GOVERNMENT ACT ......................................................................... 67

COUNT XII: VIOLATION OF OKLAHOMA MEDICAID FALSE CLAIMS ACT (63 Okl. Stat. Tit 63, § 5053 et seq.). ................................................................................. 68

COUNT XIII: VIOLATION OF TENNESSEE MEDICAID FALSE CLAIMS ACT (Tenn. Code Ann. § 71-5-182(a)(1)). ............................................................................... 69

COUNT XIV: TEXAS MEDICAID FRAUD PREVENTION ACT (Tex. Hum. Res. Code § 36.001 et seq.). ........................................................................................................ 71

COUNT XV: VIOLATION OF VIRGINIA FRAUD AGAINST TAXPAYERS ACT (Va. Code Ann. § 216 et seq ...................................................................................... 73

PRAYER FOR RELIEF. ............................................................................................. 74

Ms. Kelly Oxendine ("Relator") brings this action on behalf of the United States of America and the Qui Tam States (as set out below) against Defendants, HCA Holdings, Inc. f/d/b/a HCA, Inc. f/d/b/a HCA – Hospital Corporation of America f/d/b/a Hospital Corporation of America f/d/b/a HCA – The Healthcare Company and Parallon Business Solutions, LLC (collectively, "Defendants,"), pursuant to the qui tam provisions of the Federal Civil False Claims Act, 31 U.S.C. § 3729, et seq. and pursuant to the qui tam provisions of the following States: the California False Claims Act, Cal. Gov't Code § 12650 et seq. (Deering 2000); the Colorado Medicaid False Claims Act, Colo. Rev. Stat. § 25.5-4-304 et seq. (2010); the District of Columbia False Claims Act, D.C. Code § 2-308.13 et seq. (2000); the Florida False Claims Act, Fla. Stat. § 68.081 et seq. (2000); the Georgia False Medicaid Claims Act, Ga. Code Ann. § 49-4-168 et seq. (2007); the Indiana False Claims and Whistleblower Protection Act, Ind. Code § 5-11-5.5 et seq. (2007); the Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann. § 46:437.1 et seq. (2006); the Nevada False Claims Act, Nev. Rev. Stat. § 357.010 et seq. (2007); the Oklahoma Medicaid False Claims Act, Okla. Stat. tit. 63, § 5053 et seq. (2007); the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181 et seq. (2006); the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code Ann. § 36.001 et seq. (West 2006); the Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1 et seq. (2011); ("State Qui Tam Statutes" or "Qui Tam States").

## I.    INTRODUCTION.

1.    Relator brings this action on behalf of the United States and the Qui Tam States to recover damages and civil penalties under the False Claims Act and State Qui Tam Statutes against Defendants for causing the submission of false or fraudulent claims; for making, using, or causing to be made or used false records or statements material to false or fraudulent claims;

for making, using, or causing to be made or used false records or statements material to obligations to pay or transmit money to the Government, or knowingly concealing or knowingly and improperly avoiding or decreasing obligations to pay or transmit money or property to the Government.

2.       The action is premised upon Defendants' scheme to defraud the United States by knowingly overbilling, and failing to reimburse, the following Government-sponsored Insurance Programs:

a.       The federally funded Medicare Program, Title XVIII of the Social Security Act, 42 U.S.C. § 1395 et seq.;

b.       The federally and state funded Medicaid Program, Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 et seq.; and

c.       TRICARE (f/k/a CHAMPUS), a federally-funded program of the U.S. Department of Defense that provides medical benefits, including hospital services, to (a) the spouses and unmarried children of (1) active duty and retired service members, and (2) reservists who were ordered to active duty for thirty days or longer; (b) the unmarried spouses and children of deceased service members; and (c) retirees.10 U.S.C. §§ 1971-1104; 32 C.F.R. § 199.4(a)

(Collectively the "Government-sponsored Insurance Programs").

3.       Defendants recklessly and purposefully overbilled the government by submitting millions of dollars of false claims to these Government-sponsored Insurance Programs.

4.       Defendants put in place a system that encourages its employees and agents to engage in overbilling. Relator has knowledge that Defendants are deliberately unbundling procedures in order to obtain additional credits or "stats" in order to boost internal productivity ratings. This system wherein higher ratings result in benefits, including bonuses, creates incentives for departments to engage in overbilling and has resulted in overbilling of Government-sponsored Insurance Programs.

5.    The Relator possesses and has provided  independent knowledge of seven examples of systematic overbilling by Defendants, where Defendants know they overbilled the Government yet have failed to fully audit and remit past overpayments and/or failed to implement safeguards to prevent overbilling going forward, including:

**Example 1:**    <u>Stacking</u>: In late 2011, Relator discovered that Defendants were overbilling the Government through a scheme known as "stacking." Coding rules state that the billing codes for certain complex procedures are meant to include, and thereby preclude separate billing for, less complex procedures rendered in conjunction with the complex procedure. Stacking occurs when both the complex service and the lesser included service are billed separately, resulting in the lesser service being billed twice.

**Example 2:**    <u>Obstetric Overbilling</u>: In mid-2012, Relator discovered that Defendants were double billing the Government for certain services administered to pregnant women at Defendants' Trinity hospital. The obstetric overbilling occurred when two departments within the hospital billed and received payment for the same procedure, which was only administered once.

**Example 3:**    <u>Fluoroscopy Overbilling</u>: Approximately four years ago, Relator discovered that Defendants were overbilling the Government for fluoroscopies (a type of x-ray imaging). The double billing occurred when a fluoroscopy was billed as part of a bundled charge and was also billed under a separate code for the same service.

**Example 4:**    <u>Ventilation Overbilling</u>: In September 2009, Relator discovered that Defendants were improperly billing the Government for services relating to setting up ventilation treatments in its emergency rooms and outpatient operating rooms by charging for the initial setup of the ventilator separately in addition to including it in the overall charge of the room or procedure.  Defendants were also improperly charging a second day fee on the first day of ventilation treatment for admitted patients.

**Example 5:**    <u>Intravenous Overbilling</u>: In November 2012, Relator discovered that Defendants were overbilling the Government for intravenous (IV) infusions by not accurately recording the start and stop times for infusions;

**Example 6:**  Laboratory Test Overbilling: Relator discovered that the Defendants were overbilling the Government by billing for laboratory tests that were not ordered by the doctor in the medical record.

6.    In each instance, Defendants submitted claims for payment to the Government-sponsored Insurance Programs, with knowledge that the claims were false and/or with reckless disregard for their truth.

7.    Often after discovering they were submitting inaccurate and false billing to the Government-sponsored Insurance Programs, Defendants intentionally failed to sufficiently audit their medical billing practices, ignored their statutory and assumed duties (under applicable federal/state regulations and a relevant Corporate Integrity Agreement), to report the overbilling to the Government, and purposefully withheld funds owed to the Government due to overpayment.

8.    Defendants, under the guise of compliance with a previously imposed Corporate Integrity Agreement and with regulatory requirements, built a facade of "revenue integrity" that, rather than ensuring accurate and proper billing of Government-sponsored Insurance Programs, allowed the Defendants to selectively audit, under-report, or entirely veil the rampant false and improper billing practices of their hospitals across the nation.

## II.    JURISDICTION AND VENUE.

9.    This Court has jurisdiction to entertain this qui tam action and has federal subject matter jurisdiction over this action pursuant to 31 U.S.C. 3732(a), 28 U.S.C.A. § 1331 and 28 U.S.C § 1345.

10.    This Court has original jurisdiction of the State law Claims as provided by 31 U.S.C. § 3732(b) because this actions is brought under State laws to recover funds paid by the

Qui Tam States, and arises from the same transaction or occurrence brought on behalf of the United States as defined by 31 U.S.C. § 3730.

11.    This Court has supplemental jurisdiction over the counts relating to the state False Claims Acts pursuant to 28 U.S.C. § 1367.

12.    This Court has personal jurisdiction over Defendants pursuant to 28 U.S.C.A 3732(a) because Defendants can be found in and transacts substantial business in this District.

13.    Venue is proper in this District under 31 U.S.C. § 3732(a) because Defendants transact business in this District and numerous acts proscribed by 31 U.S.C. § 3729 occurred in this District.

14.    HCA Holdings, Inc. operates the HCA South Atlantic Division in Charleston, South Carolina, located at 900 Island Park Drive, Suite 202A, Charleston, SC, 29492.  This division operates a six-system health network, providing over 1,500 hospital beds in facilities in South Carolina and Florida.

15.    Relator's claims and this Complaint are not based upon allegations or transactions which are the subject of a civil suit or an administrative civil money penalty proceeding in which the Government is already a party, as enumerated in 31 U.S.C. § 3730(e)(3).[1]

16.    The causes of action alleged are timely brought because of the efforts of the Defendants to conceal from the United States their wrongdoing in connection with the allegations herein.

17.    Defendants further concealed their wrongful conduct by directing employees to perform woefully deficient billing audits, process known billing errors for payment, and to

---

[1] To the extent that conduct alleged in this Complaint occurred prior to March 23, 2010, the prior versions of the False Claims Act are applicable (*i.e.,* 31 U.S.C. § 3730(e), as amended, October 27, 1986 and May 20, 2009).

falsely certify the Defendants' compliance with federal and state laws, and the terms of applicable Corporate Integrity Agreements.

18.    Defendants' conduct had a material effect on the Government's decision to pay Defendants' bills for medical services. Had the Federal Government and Qui Tam States known that HCA submitted false billing, or that HCA represented or caused healthcare providers to submit false billing, the Federal Government and Qui Tam States would not have authorized the payments for the billing.

19.    Defendants' fraudulent and false billing scheme is ongoing.

20.    Relator has made voluntary disclosures to the United States Government prior to the filing of this complaint and has filed a Disclosure Statement with the United States as required by 31 U.S.C. § 3739(b)(2). Disclosures have or will be made to the Qui Tam States.

## III.    PARTIES.

### A.    Plaintiff/Relator Kelly Oxendine.

21.    Relator, Ms. Kelly Oxendine, L.P.N., is a citizen and resident of Palm Harbor, Florida.[2] She is a Licensed Practical Nurse in Florida who has an extensive background in medical billing, coding for medical billing, and medical management. Relator works as part of HCA's Revenue Integrity Department, which HCA created in compliance with the *$1.7 billion* settlement of a series of false claims lawsuits in 2000 and 2003. She is a Lead Revenue Integrity Nurse for HCA's subsidiary, Defendant Parallon Business Solutions, LLC, and supervises other Revenue Integrity Nurses and Analysts at twenty-two of HCA's hospitals in Florida. The Revenue Integrity Nurses are charged with reviewing the accuracy of HCA's billing. Relator's responsibilities include auditing assigned accounts and reviewing medical billing records for problems that could result in overpayment or underpayment for HCA's services

_____

[2] Ms. Oxendine was formally known as Kelly Day and legally changed her name in December 2011.

22.     Relator performs her work at one of HCA and Parallon's centralized regional administrative centers, called a "Shared Service Center." These Shared Services Centers provide administrative support, such as billing support, to the HCA hospitals in their region. There are two such centers in Florida. The Center at which Relator works is located 31975 US Highway 19, North Palm Harbor, Florida.[3]

23.     Relator is an original source who has direct, independent and personal knowledge of the information upon which the allegations herein are based. These allegations are not based upon publicly disclosed information.

**B.      Defendant HCA Holdings, Inc.**

24.     Defendant HCA Holdings, Inc. is a for-profit corporation organized, existing, and doing business under and by the laws of Tennessee, with its principal place of business at One Park Plaza, Nashville, TN 37203-6527. The registered agent of HCA Holdings, Inc. is CT Corporation System, 800 S. Gay Street, Suite 2021, Knoxville, TN 37929-9710. HCA has formerly done business as, inter alia, HCA, Inc., HCA-Hospital Corporation of America, and Hospital Corporation of America, which are now assumed/fictitious names of HCA Holdings, Inc. HCA Holdings. Inc. is listed on the New York Stock Exchange and trades under the symbol HCA. Through its direct and indirect subsidiaries, HCA Holdings, Inc. is in engaged in the ownership of hospital and surgical centers, and provides medical and healthcare services.

25.     Defendant HCA Holdings, Inc. is the largest hospital chain in the United States. It claims to provide approximately four to five percent of the all inpatient care in the United States and employs more than 199,000 employees in its 163 hospitals and 113 free standing surgery centers. HCA Holdings, Inc. operates medical facilities in Alaska, California, Colorado, Florida,

---

[3]  The other Florida Shared Service Center is in Orange Park, Florida. The Tampa Shared Service Center primarily oversees West Florida and the Orange Park Shared Service Center primarily oversees East Florida. The two divisions share oversight of North Florida HCA facilities, each taking approximately half.

Georgia, Idaho, Indiana, Kansas, Kentucky, Louisiana, Missouri, Mississippi, New Hampshire, Nevada, Oklahoma, South Carolina, Tennessee, Texas, Utah and Virginia, in addition to facilities in the United Kingdom.

26.    HCA Holdings, Inc., and its related business entities, have a long history of submitting false claims to the government, and have been subjected to millions of dollars in fines and sanctions. Included among these are the settlements reached in 2000 and 2003 totaling $1.7 billion. As part of these settlements, HCA, Inc. entered into an eight year "Corporate Integrity Agreement" ("CIA") with the Office of the Inspector General of the Department of Health and Human Services, to ensure HCA, Inc.'s "compliance with the requirements of Medicare, Medicaid and all other Federal healthcare programs," specifically including coding and billing mandates.

27.    The CIA required HCA, Inc. to proactively identify overpayments by the Government and to repay the Government within 30 days of identification. Relator has knowledge of purposeful conduct by the Defendants that violated the terms of the CIA while it was in effect. Additionally, Relator's information demonstrates that previous sanctions and settlements have had no punitive or corrective effect upon the company now known as HCA Holdings, Inc., which continues to engage in fraudulent overbilling practices and has been the subject of numerous additional false claims actions. For example, in 2012, HCA, Inc. agreed to pay $16.5 million to settle claims that two of its Tennessee subsidiaries violated False Claims and anti-kickback laws by providing financial benefits in exchange for patient referrals. In July of 2013, the Department of Justice announced a series of settlements with hospitals relating to false claims for kyphoplasty procedures. Among the settling defendants were twenty-three HCA Holdings, Inc. hospitals that collectively paid $7,145,842.72 to resolve the allegations. In

addition, an HCA Holdings, Inc. facility in Augusta, Georgia recently settled another false claim case with the Department of Justice relating to improperly supervised and overbilled radiation treatments.

28.     Relator's information and knowledge involves conduct entirely separate and distinct from HCA's previously exposed conduct.

### C.     Defendant Parallon Business Solutions, LLC.

29.     Defendant Parallon Business Solutions, LLC, ("Parallon") is a wholly-owned subsidiary of HCA Holdings, Inc. Parallon was formed on May 9, 2011, and was organized, exists, and does business under and by virtue of the laws of the State of Tennessee, with its office and principal place of business located at One Park Plaza, Nashville, TN 37203-6527. In Tennessee, the registered agent of Parallon and all of its "business units" is CT Corporation System, 800 S. Gay Street, Suite 2021, Knoxville, TN 37929-9710.

30.     Parallon is a foreign company registered to do business in the State of South Carolina and does business in this state. Its Registered Agent in South Carolina is CT Corporation System, located at 2 Office Park Court, Suite 103, Columbia, SC, 29223.

31.     Parallon claims to provide healthcare organizations with financial management, supply chain, purchasing, I.T., and staffing services. Despite its formation in 2011, Parallon promotes and markets itself as having existed for over ten years[4] and asserts that its "shared service solutions" have been developed and proven in 250 hospitals and 2,000 non-acute care providers across the United States.

32.     HCA uses Parallon to design, implement, manage and oversee the tracking and accumulation of revenue, as well as payroll, information systems, supply chain, and logistics for

---

[4] *See* http://parallon.com/about-us (last visited on October 3, 2013)

it businesses, including the billing and collection of payments for the healthcare services provided at HCA hospitals across the nation.

33. Parallon is made-up of at least six "business units" including:

a. HSS Systems, LLC, which operates as a foreign company doing business in the State of Tennessee under the assumed named, "The Parallon Business Performance Group." HSS Systems, LLC is a for-profit company and was organized, exists, and does business under and by virtue of the laws of the State of Delaware, with its office and principal place of business located at One Park Plaza, Nashville, TN 37203-6527. This Parallon unit has responsibility for revenue cycle management, payroll, health information management and physician credentialing. Service offerings from the Parallon Business Performance Group include hospital revenue cycle outsourcing, consulting, management services, collection agency services, and payment compliance and denial management.

b. Parallon Workforce Management Solutions, LLC is a for-profit company and was organized, exists, and does business under and by virtue of the laws of the State of Tennessee, with its office and principal place of business located at One Park Plaza, Nashville, TN 37203-6527. This is a business unit that claims to provide strategic healthcare staffing and recruiting solutions to improve patient care and enhance operational performance with technology and services. According to Parallon, this unit helps healthcare providers reduce the use and cost of contract labor and the need for premium pay, increase operational efficiencies and improve employee satisfaction. Parallon Workforce Management Solutions,

LLC is also registered to do business in the State of South Carolina  as a foreign company and does business in the this state. Its Registered Agent in South Carolina is CT Corporation System, located at 2 Office Park Court, Suite 103, Columbia, SC, 29223.

c.      Central Shared Services, LLC is a foreign company in doing business in the State of Tennessee under the assumed named, "Parallon Supply Chain Solutions, LLC." Central Shared Services, LLC, is a for-profit company and was organized, exists, and does business under and by virtue of the laws of the State of Virginia, with its office and principal place of business located at One Park Plaza, Nashville, TN 37203-6527. Parallon Supply Chain Solutions, LLC is a unit that provides outsourcing, consulting, and management services designed to optimize facility inventory, spending and standardization to ensure healthcare providers have the right products at the right time.

d.      HCA - Information Technology & Services, Inc., is a foreign company doing business in the State of Tennessee under the assumed named, "Parallon Technology Solutions, Inc.," and is responsible for creating and managing the billing and auditing software and corresponding hardware used by the Defendants. HCA-Information Technology & Services, Inc., is a for-profit company and was organized, exists, and does business under and by virtue of the laws of the State of Delaware, with its office and principal place of business located at One Park Plaza, Nashville, TN 37203-6527.

e.      Parallon Health Information Solutions, LLC, was organized, exists, and does business under and by virtue of the laws of the State of Tennessee, with its

office and principal place of business located at One Park Plaza, Nashville, TN 37203-6527. Parallon Health Information Solutions, LLC is registered to do business in the State of South Carolina as a foreign company and does business in this state. Its Registered Agent in South Carolina is CT Corporation System, located at 2 Office Park Court, Suite 103, Columbia, SC, 29223.

f.      Parallon Enterprises, LLC f/k/a Parallon Employer, LLC was organized, exists, and does business under and by virtue of the laws of the State of Tennessee, with its office and principal place of business located at One Park Plaza, Nashville, TN 37203-6527. Parallon Enterprises, LLC is registered to do business in the State of South Carolina as a foreign company and does business in this state. Its Registered Agent in South Carolina is CT Corporation System, located at 2 Office Park Court, Suite 103, Columbia, SC, 29223.

34.     Because the Parallon entities are wholly-owned subsidiaries of HCA Holdings, Inc., and are the mechanism by which it reviews, generates, audits and processes improper bills for payment and repayments to the Government, Parallon also created, caused to be created, false billings for payment by the Government, as well as failed to report and return overpayments to the Government. Therefore, the Parallon entities are named as separate Defendants in this action. Collectively, HCA Holdings, Inc., and the Parallon entities are hereinafter referred to as "Defendants" unless otherwise identified.

**D.      Government Plaintiffs.**

35.     The United States of America, the District of Columbia and the states of Florida, California, Colorado, Georgia, Indiana, Louisiana, Nevada, Oklahoma, Tennessee, Virginia and

Texas, are the Government Plaintiffs on behalf of whom recovery is sought for damages to the Medicare program, the federal-state Medicaid programs and the TRICARE health program.

## IV.    DEFENDANTS' VIOLATIONS OF THE FALSE CLAIMS ACT & THE STATE QUI TAM STATUTES.

### A.    Background.

#### 1.    The HCA Revenue Integrity Department and Creation of Parallon.

36.    Defendant HCA established a centralized Revenue Integrity Department after entering into a series of settlements with the Government totaling $1.7 billion in 2000 and 2003 for submitting false claims to Government-sponsored Insurance Programs, among other wrongful actions.

37.    As the result of these earlier false claims and billing violations, HCA entered into a Corporate Integrity Agreement ("CIA") with the Office of Inspector General of the Department of Health and Human Services. The CIA was in place for eight years, starting in 2000, and expiring in 2008. The CIA established a heightened standard of care and duty to honestly and accurately bill for its medical services. HCA's officers and directors were required to certify compliance with the CIA on a routine basis with the Government.

38.    After entry into the CIA, HCA centralized its revenue integrity and billing into a number of regional Shared Service Centers. The consolidation gave HCA greater corporate control over billing, including billing Government-sponsored Insurance Programs. The change also helped to ensure that HCA was alerted to overbilling violations at its various hospitals.

39.     While operating under a CIA, healthcare providers "must promptly notify the appropriate payer of all identified overpayments and must promptly repay the overpayment amount in a manner consistent with the payer's policies."[5]

40.     In May 2011, HCA launched Parallon Business Solutions ("Parallon"), a subsidiary company of HCA. Parallon's stated purpose is to offer "best practices" to hospitals and medical businesses in operational, technical and employment management.

41.     The Shared Service Centers became part of a Parallon business unit, the "Parallon Business Performance Group." Defendants use this arm of the Parallon venture to carry out all of Defendants' billing, collections, and payroll and also to carry out integrity compliance activities.

42.     Relator is currently employed by Parallon Business Solutions, under their Parallon Business Performance Group business unit.

43.     Defendants make it clear that Parallon's focus is increasing hospital revenue, both for themselves and for the non-HCA hospitals to which it outsources its services. Parallon's website states as follows:

> We offer real-time payment compliance and denials management as part of our full-service outsourcing services, as well as on a stand-alone basis. We *successfully recover more than $750 million annually for our clients* through best-practice processes and continuous improvement. Our seasoned team has the right clinical and operational expertise, payer relationships, and advanced modeling and data analytics to:
>
> - *Increase Net Revenues through underpayment recoveries* by 1 to 3% and an additional 1 to 3% through overturned denials
> - Maximize net revenue accuracy
> - Identify the root cause of issues to facilitate processing and payer mitigation
> - *Increasing average hospital's net revenue 2% to 6%; reducing cost-to-collect by 10% to 30%*
> - *Recovering nearly $750 million in underpayments in 2012*
> - *More than $35 billion in annual cash collections*

---

[5] *See* http://oig.hhs.gov/faqs/corporate-integrity-agreements-faq.asp, last visited on October 2, 2013.

- *Consistently maintaining cash levels at or above 100% of target.*

http://parallon.com/node/49 (last visited on October 17, 2013) (emphasis added).

44.    It is under this umbrella of maximizing hospital profits that HCA has housed its Revenue Integrity Department; the very program that supposedly bears the responsibility for ensuring that HCA does not overcharge the Government for its services and, in theory, is supposed to return any overbilling to the Government.

### 2.    Defendants' Billing Error Review Process.

45.    As part of the Revenue Integrity Department, Relator monitors the billing practices of HCA.

46.    The Revenue Integrity Department is outwardly portrayed to be the arm with which HCA ensures that all medical service claims are coded and billed properly, a responsibility which Relator takes seriously and seeks to fulfill.

47.    Relator reviews the billing activities of twenty-two HCA-owned Florida hospitals, and supervises a Revenue Integrity Nurse in each hospital. Relator and her team of Revenue Integrity Nurses locate system billing errors, work to correct bills after reviewing the medical record associated with the billing errors, and try to implement changes to prevent the billing errors from reoccurring.

48.    The Revenue Integrity Nurses work to identify and correct billing errors before the bills are submitted to the patients and to the patients' private insurers, or Government-sponsored Insurance Programs, as well as identify and correct systemic or past billing errors.

49.    While Relator and her team look for both overbilling and under-billing by the Defendants, Defendants make it clear that the main purpose of the Revenue Integrity Department

is to capture and correct under billing, as shown in Parallon's own statements (set out above) and by Defendants' actions.

50.    Defendants' code-based billing is created when services are entered into a computer known as the "Medi-Tech System," and processed through the "host/patient accounting;" a hospital-specific computer file that includes all hospital procedures, services, supplies, and drugs that are billed.

51.    The billing records are coded through a series of standardized "CPT" codes, set out by the American Medical Association ("AMA"). Each year, the AMA publishes the Current Procedure Terminology (CPT) codebook. The CPT codebook is a listing of descriptive terms and identifying codes for reporting medical services and procedures performed by physicians.[6]

52.    After being entered, the CPT code entries associated with each patient record are then processed through the E-Request system, an internal automated billing review system in patient accounting that examines the CPT codes entered into the host for errors.

53.    CPT code entries that are flagged for errors in the E-Request system are then sent to the Revenue Integrity Nurses for further review.

54.    The internal automated billing review system flags billing errors by checking them against a series of known "Edits." The Edits are pre-programed codes in the E-Request system that identify and flag known billing errors. The Edits "red flag" certain entries for further review. These Edits are system wide, meaning that they are utilized in all of HCA's hospitals nationwide, and may be created by Defendants or by CMS.

55.    Defendants only create an "Edit" in the review system when a billing error has become a problem across HCA hospitals nationwide. Otherwise, the error will be addressed on a

_____

[6]The purpose of CPT codes is to provide a uniform language that will accurately describe medical, surgical and diagnostic services.

local level. The creation of an Edit in the E-Request system thus indicates that the problem addressed by the Edit is systemic to HCA's health care system and is occurring nationwide.

56.     When a billing entry is flagged for error by an Edit, it is colloquially said to have "hit an Edit." When an entry "hits an edit," it is channeled to the Revenue Integrity Nurses for review.

57.     On a typical day, Relator and her staff receive between 600-700 potential billing errors to review from the twenty-two hospitals that Relator oversees. If the reviewing Revenue Integrity Nurse determines that a flagged charge is appropriate, despite the flag, the nurse approves the charge in the billing system by adding a "modifier code" to the CPT code thereby allowing the charge to go through for billing.

58.     In addition to these daily reviews, the Revenue Integrity Nurses perform monthly limited audits of billing entries for certain hospital departments, such as the laboratory, in which random samples of billing entries are reviewed for error.

59.     If the Revenue Integrity Nurse determines a billing entry is not appropriate, the nurse may either attempt to correct the charge on her own, have the account reviewed by the Coding Department, or ask the hospital department that entered the charge to correct it.

60.     While Lead Revenue Integrity Nurses, like Relator, are responsible for reviewing flagged charges for accuracy, the internal hospital department which created the billing error is ultimately responsible for correcting the error.

61.     When Revenue Integrity Nurses are unable to get the internal departments to correct their charges, Lead Revenue Integrity Nurses make the corrections and may notify the Revenue Integrity Management team, the Primary Revenue Integrity Analyst for the hospital and the responsible director of the department where the billing error occurred.

62.     When a Lead Revenue Integrity Nurse discovers a potential billing problem, the nurse questions the director of the department in which the problem is located to determine whether the problem is localized or widespread. If it appears the error is a recurrent billing error, the nurse notifies her Revenue Integrity Regional Manager, who then will escalate the concern to the Regulatory Compliance Support section of HCA's Nashville, Tennessee-based Ethics Compliance Department.

63.     When notified of a potentially recurrent billing error, the Regulatory Compliance Support Center, commonly known within HCA as "REGS," will pull a sample of three Medicare accounts and conduct a small sample audit, limited to that facility, to determine the scope of the problem by reviewing only those three accounts.

64.     If, based on that limited audit, the billing errors appear to be systemic across that hospital facility, the Ethics and Compliance Officer for the facility reviews the audit results and associated accounts, communicates corrective action to the facility, and forwards the information on to REGS, which then conducts another limited audit, but across all HCA facilities to determine whether the billing error is isolated to just one hospital, or is systemic nationally.

65.     If Defendants determine that the billing problem is system-wide, REGS creates an Edit in HCA's billing system.

66.     REGS also conducts limited audits of Medicare bills, known as "OPPS" (Outpatient Prospective Payment System) Audits.

### 3.     Defendants' Billing Review Process is Deficient and Disguises Their Overbilling Schemes.

67.     While on its face, it appears that Defendants takes revenue integrity seriously; Defendants de-incentivize and discourage truly thorough reviews of their bills. Rather than encourage the discovery of billing errors, Defendants' Revenue Integrity Nurses are rewarded for

signing off on bills quickly. Further, Defendants improperly restrict their audits of known billing problems to only small subsets of Medicare bills within very narrow time frames.

### a.    Defendants Incentivize Insufficient and Cursory Reviews.

68.    Defendants' internal auditing processes encourage inaccurate and insufficient reviews of medical billing errors whenever such errors are discovered. Defendants' billing error review process is categorized in tiers, depending on the type of review the error requires. A "Tier 1" review constitutes a review for a relatively simple billing error, the review time for which is set at fifteen minutes. Tier 2 and 3 reviews are more complex and have longer allotted review times respectively.

69.    Defendants use these categories to assess productivity. For example, if a revenue integrity nurse completes four Tier 1 reviews in an hour, he or she would receive a productivity rating of 100% (four times fifteen minutes equals one hour of review time). However, Defendants require reviewers to meet a 110% productivity goal, and provide monetary bonuses for beating that goal.

70.    Defendants also require the revenue integrity nurses to provide a written narrative for anything more than a cursory review to justify the additional time spent. It is much faster for nurses to enter a modifier code to approve a bill which hit an Edit than it is for them to adequately review the medical record to see if the charge was proper and write the requisite justification for the more intensive review. Accordingly nurses are encouraged to perform shallow reviews of bills, and quickly approve them, in order to meet productivity goals.

### b.    Defendants Incentivize Unbundling and Double Billing.

71.    "Unbundling" is medical coding practice that, unless corrected, results in false or fraudulent billing. "Unbundling' occurs where the Medicare program prescribes a special

reimbursement rate for a group of procedures that are commonly ordered together, but instead, the procedures are billed separately at a higher and improper rate.  Pursuant to CMS rules, when ordered together, the procedures must be billed together under the combined "bundled" code, at a lower rate

72.    Relator has specific knowledge that Defendant entities are deliberately unbundling procedures in order to obtain additional credits or "stats" in order to boost internal productivity ratings. Defendants established a system by which the billable services provided by a particular department are monitored and in which departments are rewarded based on numbers of procedures performed, in effect, creating incentives for departments to engage in overbilling.

73.    This tracking system is known by Defendants' employees as the "Plus System."

74.    The Plus System is designed to track the complexity of the services provided and billed by individual departments in HCA's facilities. Pursuant to the Plus System's protocols, each procedure is assigned a numerical value known as the "plus modifier."  The more complex the procedure, the more points or "stats" it is assigned within the Plus System. For example, a minor procedure earns just one stat, an intermediate procedure earns two stats, and more complicated procedures can earn up to four stats.

75.    The stats earned through the Plus System are routinely used by Defendants' administrators to evaluate a department's performance, service activity and needs, including the need for resources and additional medical personnel in that department.

76.    HCA hospital department directors place enormous importance on their department's stats so that they can increase the overall staffing of their department and earn bonuses.

77.    The increased staff directly correlates to a department's fiscal performance. That is, the more staff available to care for a patient, the more potential opportunities to bill a patient for medical care. In turn, department directors can earn bonuses based on these numbers.

78.    The pressure for each department to acquire stats in order to increase staffing can lead to overbilling. By placing a point value on the medical services provided by individual departments within HCA's facilities and then using the points earned as an indicator for performance, as well as chits with which departments can obtain valuable resources, the Defendants' Plus System fosters an environment in which benefits can be obtained by the artificial inflation of the need for, and the complexity (and cost) of, medical services.

79.    Relator, based on her experience, has knowledge that the Plus System leads to improper billing that results in increased profits to Defendants.

80.    Relator, in her position, observes departments routinely submit erroneous billing in order to increase their departmental stats.

81.    Relator, in the performance of her job, has attempted to correct the issue of departmental overbilling, but due to its prevalence and the inadequacies of Defendants audit system, she has been unable to wholly prevent the rampant overbilling by Defendants.

82.    Therefore, overbilling is ongoing in the facilities where Defendants have implemented the Plus System.

83.    Defendants' Plus System creates an environment in which the performance of more complex procedures, or at least the appearance of a need for complex procedures to be performed, is directly related to resources and assets needed and used by specific departments in Defendants' facilities. The stats system incentivizes improper billing practices, and causes false

claims to be submitted to Government-sponsored Insurance Programs and private health care programs for payment.

84.    Relator has provided the Government with multiple examples of false billing related to "stats" awarded at HCA hospitals, including billing that demonstrates over charging of Government-sponsored and private healthcare programs by unbundling bills and falsifying the need for complex procedures.  Such disclosure was made in furtherance of this action and is protected activity under the Federal False Claims Act and the Qui Tam State analogues.

### c.    *Defendants Improperly Restrict Their Audits and Reviews of Billing.*

85.    Defendants also severely limit their reviews and only perform audits of Medicare bills, but not of any other bills, purposefully omitting bills to other Government-sponsored Insurance Programs, such as Medicaid and Tricare.

86.    Additionally, Defendants also do not perform audits of bills to private insurers or of bills to uninsured individuals.[7]

87.    As part of this restricted review, Defendants have created system-wide Edits to catch overbilling and under billing *only* for Medicare.

88.    When Relator or the team of Revenue Integrity Nurses uncovers a potential systemic overbilling error, Defendants have routinely limited its research and auditing to Medicare cases and has restricted the audits to very narrow time-frames.

89.    Relator has observed that Defendants rely inappropriately on limited periodic audits to catch and correct overbilling, instead of performing audits designed to uncover the totality of known problems.

---

[7] When conducting audits for potential overbilling, Defendants only audit "financial class one" patient records. Financial class one consists solely of Medicare files. There are fourteen total financial classes: for example, class 3 - Medicaid, class 4 – workers comp, class 5 – commercial insurance, class 6 – Tricare.

90.    For example, Defendants have routinely relied on internal OPPS audits, audits of the Outpatient Prospective Payment System for Medicare, to address many instances of known wide-scale overbilling.[8]

91.    Defendants conduct OPPS audits on a facility-by-facility basis, and during these audits pull only a small sample of Medicare bills from a time period of approximately six months, or less, to review them for billing errors. These internal OPPS audits are targeted to specific areas of service, or to specific departments.

92.    When Relator has reported instances of long-term, wide-spread overbilling, to Defendants, she has frequently been told that the overbilling would be addressed through an OPPS audit. However, she has observed that the OPPS audit is insufficient to capture all past overbilling of which Defendants are aware.  Typically, the Defendants' OPPS audits are the only audit performed.  Because each OPPS audit targets only a particular facility and covers only a six month time period, OPPS audits are, by their terms, inadequate to assess system wide overbilling occurring over many years.

93.    A number of long term audits and a massive repayment would be necessary to correct the overpayments that have been personally observed by Relator. Because of Relator's position and responsibilities, these necessary comprehensive audits and repayments could not have occurred without Relator's knowledge or without her department's assistance. Because Relator has seen no evidence of any wide-scale audits and repayments, she has certain knowledge that they have not occurred.

---

[8] OPPS was established by CMS in 2000 and authorized by Section 1833(t) of the Social Security Act as amended by Section 4533 of the Balanced Budget Act of 1997. In general, OPPS is used for designated hospital outpatient services. In contrast, Diagnosis-related Group (DRG) would govern inpatient care. The OPPS system was established by CMS in 2000, and it allows for hospitals to be paid a set amount of money (called the payment rate) to provide certain outpatient services to Medicare recipients.

### d.     *Defendants Do Not Enforce Training Requirements.*

94.     Contrary to its prior CIA obligations and current regulations, Defendants do not make certain their employees stay abreast of the most up-to-date coding regulations.

95.     CPT billing of government-insured programs requires complete understanding of the coding system, which goes through frequent updates, Defendants are supposed to make certain that their code-entering employees take required continuing education classes. *See e.g.* 42 CFR § 422.503.

96.     Relator has observed that Defendants fail to ensure that their employees receive proper training and that the facility Ethics and Compliance Officers often fail to enforce training requirements.

97.     As a result, it has been Relator's experience that, outside of the Revenue Integrity Department, HCA directors' and hospital staff's knowledge of the education and training requirements of government-insured programs is severely deficient.

98.     Relator knows that the deficient knowledge and training of Defendants' employees and agents results in inaccurate billing and overpayments by the Government and private health insurance programs, and these overpayments are wrongfully retained.

**B.     Examples of Defendants' Overbilling, Failure to Audit, and Failure to Remit Overpayments.**

99.     Through her work as a Lead Revenue Integrity Nurse, Relator has uncovered numerous instances of overbilling and of failure to repay the government for known overbilling of Government-sponsored Insurance Programs. Some of these overbilling schemes are systemic and extend across all of Defendants' facilities in the nation, whereas some appear to be limited to specific departments or hospitals.

100.    Relator has discovered that Defendants wrongfully retain past overpayments made by the Government when they deliberately and routinely fail to fully review their records to determine the full extent of overbilling which has already occurred.

### 1.    Example No. 1: Stacking of IV Services.

101.    Billing both a complex procedure and a lesser non-concurrent procedure, when government regulations mandate that only the more complex procedure be billed, is known as "stacking."

102.    All instances of stacking constitute overbilling.

103.    The CPT codes associated with hydration, injections, infusions and chemotherapy infusion provide that when less complex procedures are administered in conjunction with more complex procedures, and during the same time period, only the more complex procedure may be billed.

104.    The cost of the less complex procedure is meant to be subsumed by the bill for the more complex procedure. This structured billing is known as a hierarchy.

105.    Intravenous ("IV") services are one category of services which are covered by a CMS hierarchy. The IV services billing hierarchy consists of the following services, in descending order of complexity:

- Chemotherapy Infusions
- Non- Chemotherapy Infusions
- Injections/IV Push
- Intravenous Hydration Therapy

106.    Pursuant to the CMS hierarchy for IV series, IV administration of chemotherapy is always billed as a primary service to all other non-chemotherapy infusion charges, meaning that if any of the lesser services are administered concurrently with the chemotherapy infusion,

the lesser services should not be billed separately, but are subsumed within the chemotherapy infusion charge.

107.    The hierarchy continues such that non-chemotherapy infusions are billed as a primary service to injection/IV push charges and IV hydration therapy is always billed secondary to injections/IV push.

108.    If a primary service and a secondary service are administered concurrently, then only the primary service may be billed. If the secondary service continues for a longer duration than the primary service, then only the non-concurrent time for the secondary service may be billed.

109.    The services may only be billed concurrently if the medical record for the patient reflects that the services were administered through two separate IV sites (e.g. one through an IV in the left arm, and one through an IV in the right arm).

a.    *Realtor's Discovery of Wide-Spread Stacking by Defendants.*

110.    Relator first discovered that HCA hospitals were stacking their IV billing when she was working at Oak Hill Hospital, one of HCA's Florida Hospitals. At that time, Relator reported the false billing to the Oak Hill Surgery Department Director Ms. Brenda Cavonis and Chief Financial Officer Mr. Chance Phillips.

111.    When Relator was later promoted to be Lead Revenue Integrity Nurse in Florida, and started working for HCA's subsidiary, Parallon Business Solutions, LLC, she began working on accounts for other facilities and discovered that stacking was occurring in those facilities as well.

112.    In late 2011 and early 2012, Relator began examining Florida billing records related to IV services and she determined that Defendants were still stacking the billing of IV services, and that the stacking was widespread.

113.    Relator determined that bills for IV services were being stacked at all of the twenty-two facilities in Florida for which Relator was responsible, primarily in the emergency room and in HCA's outpatient centers for infusion patients.

114.    Despite reporting the issue to her superiors, Relator and her team of Revenue Integrity Nurses continued to see overbilling issues related to stacking across all of Defendants' facilities in the state of Florida well into 2013.

115.    Relator knows that this stacking is occurring nationwide based on the prevalence of the IV stacking in the Florida hospitals, and in light of the her experience with HCA REGs and the Edit system.

116.    The overbilling of government-sponsored program through the stacking of HCA hospital infusion services is massive. According to Relator, a single individual HCA infusion center may see between 50-100 patients per day.

117.    To date, Defendants have not notified the Government of this billing error nor taken corrective action to repay the overpayment caused by the false and inaccurate billing.

    b.    **Defendants Knowingly Overbilled the Government by Stacking and Failed to Take Corrective Action.**

118.    In November 2011, when Relator discovered that Defendants were stacking their IV service billing, Relator reported the improper stacking to her supervisor, Ms. Mav Watson. Ms. Watson told Relator that the issue would be addressed as part of Defendants' OPPS audits. [9]

---

[9] Ms. Watson is the West Florida Revenue Integrity Manager and frequently consults with Relator regarding audits and coding based issues.

119.    In the spring of 2012, during the OPPS audits, which were conducted on a facility-by-facility basis, Defendants pulled small samples of Medicare bills from specific departments or service groups to determine whether Medicare was being appropriately billed. When Relator examined the parameters of the internal OPPS audit for IV services, and noted that it covered only a few months of billing in 2012.

120.    While Relator was told that the audit to address IV stacking would go back twelve years, she has seen no evidence of such an audit, nor has she seen evidence of any large repayment to Medicare. Because of Relator's position within Parallon, a large audit could not have been performed without her knowledge and involvement. Accordingly, Relator knows that the comprehensive audit did not occur, nor is any such audit planned.

121.    Because the audit was severely and improperly limited, it failed to uncover the full extent of Defendants' overbilling for IV services, allowing Defendants to knowingly and wrongfully retain Government overpayments for those services.

122.    Defendants failed to adequately utilize their revenue integrity system to prevent overbilling of the Government, and recklessly disregarded the accuracy of its billing related to IV services, even after discovering that false or inaccurate billing had been submitted for payment.

### 2.      Example No. 2: Overbilling of Obstetric Services.

123.    Relator has knowledge and information that Defendants have been double billing for certain obstetric services for six years at Trinity Hospital, one of HCA's facilities.

124.    The double billing is primarily related to Medicaid patients.

125.    Pregnant women commonly receive a biophysical profile ultrasound during their last trimester of pregnancy to measure the health of the baby. A biophysical profile requires an ultrasound and frequently also requires an additional test called the fetal non-stress test.

126.    Pursuant to CMS guidelines and the associated CPT codes, where a non-stress test is performed by the same department as part of the biophysical profile, the non-stress test may only be billed under a combined code for biophysical profile plus non-stress test (CPT code 76818).

127.    Where either test is performed without the other, a standalone code for a lower amount is required: CPT 76819 (fetal biophysical profile without non-stress test or CPT 59025 (standalone non-stress test).  Additionally, where the two tests are performed by two separate departments, separate codes must be used instead of the bundled code (CPT 76819 for the standalone biophysical profile and 59025 for the standalone non-stress test).

128.    Double billing occurs where both procedures are performed and the bundled code is used in addition to a standalone code, resulting in one of the procedures being billed twice (once through the bundled code and again through the standalone code).

129.    In July 2012, Relator discovered that obstetric double billing was occurring Trinity Hospital, one of HCA's Florida hospitals. Trinity Hospital nurse, Ms. Delores Abad, notified Relator that when patients received a fetal non-stress test as part of a biophysical profile at Trinity Hospital, in addition to being billed for CPT code 76818, (biophysical profile plus non-stress test) which was billed by the obstetric department, HCA's radiology department was also billing for a stand-alone fetal non-stress test using CPT code 59025, resulting in the procedure being billed twice.

130.    While the radiology department was performing the non-stress test component, the test was already being billed for by the obstetric department under bundled CPT code 76818. This code included the charge for a component of the non-stress test which was not performed by the radiology department and had already been correctly billed through the obstetrical department.

### a.    *Defendants Knowingly Double Billed the Government and Failed to Take Corrective Action.*

131.    Upon discovering the issue, Relator reported the double billing problem to the hospital's department directors and to her own supervisor, Mav Watson.

132.    In July 2012, Nurse Abad told Relator in an email that Defendants had been double billing Medicaid for obstetric services at Trinity Hospital for at least five years.

133.    Although Defendants were notified of the double billing, and the billing error was corrected going forward, because Defendants do not, as a practice, perform audits of Medicaid patient billing records, Defendants did not determine the extent of past double billing or the full amount of money that Defendants have received for services that were improperly double billed to Medicaid.  To date, Defendants have not repaid any funds received from this false and inaccurate billing of obstetric services.

134.    Trinity Hospital has a large obstetrics unit and services many Medicaid patients and many Tricare patients.  It has a large military patient list because it is located in Pasco County, very near the U.S. Air Force and U.S. Coast Guard military bases in that area.

### 3.    Example No. 3:  Overbilling of Fluoroscopy Services.

135.    Relator discovered that the Defendants had been double billing fluoroscopies by separately billing for fluoroscopies where they were already being billed as part of a combined code for a larger procedure.[10]

136.    Fluoroscopies are performed and billed by HCA's radiology departments. Fluoroscopies are often performed in conjunction with another procedure; they must be billed for as part of a bundled CPT code which covers both procedures.  If the radiology department performs a fluoroscopy as part of another procedure, and then charges both a bundled code and also a separate fluoroscopy code, the fluoroscopy is improperly billed twice.

137.    While Relator first discovered that fluoroscopies were being double billed at a single Florida hospital, she has since discovered evidence that the double billing is taking place nationwide.

138.    Relator discovered the fluoroscopy double billing approximately four years ago, while working at Oak Hill Hospital as its Revenue Integrity Analyst.

139.    For all procedures which required a fluoroscopy as a necessary step, in addition to using the bundled codes, the Oak Hill radiology department was also separately billing for a fluoroscopy.

140.    After becoming a Lead Revenue Integrity Nurse, reviewing bills from other Florida hospitals, and discussing the double billing problem with her supervisors, Relator discovered that all HCA hospitals were double billing for fluoroscopies.

---

[10] Fluoroscopy is an imaging technique that uses <u>X-rays</u> to obtain real-time moving images of the internal structures of a patient. A fluoroscope consists of an X-ray source and fluorescent screen between which a patient is placed. Modern fluoroscopes couple the screen to an <u>X-ray image intensifier</u> and <u>CCD</u> <u>video camera</u> allowing the images to be recorded and played on a monitor.

141.    Relator's supervisor, Ms. Watson, and Revenue Integrity Director Ginger Foley told Relator that fluoroscopy overbilling was a wide spread problem at HCA hospitals across the country.

142.    Relator also discovered that, even after an Edit was entered into the billing review system to catch instances of double billing, Defendants' employees were knowingly overriding the Edit with a modifier code thereby approving the double billed entries and sending them out for payment.

> **a.    Defendants Knowingly Double Billed the Government for Fluoroscopy Services and Failed to Take Sufficient Corrective Action.**

143.    While Defendants have implemented a system to prevent future overbilling, which includes an "Edit" in the E-Request billing review system as noted above, this system can be and is being circumvented when nurses override the Edit with modifier codes, approve the double billed entries and send them out for payment.

144.    Additionally, even though Defendants knew that fluoroscopies have been consistently double billed for years, Defendants have chosen not to perform a comprehensive audit, but to instead rely solely on the limited OPPS audits, which only pull and correct a small sample of bills from a brief period of approximately six months.

145.    To date, Defendants have failed to conduct a comprehensive audit of past bills to determine the extent to which double billing of fluoroscopies has occurred, and thereby, has wrongfully retained payments for all previous double payments which has been made by the Government for fluoroscopy services.

### 4.    Example No. 4: Overbilling for Ventilation Set Ups.

146.    Defendants have engaged in systemic overbilling related to respiratory treatment and continue to knowingly fail to repay the Government for the overbilled amounts.

147.    HCA's respiratory therapy departments are double billing and unbundling charges for setting up patient ventilation systems in outpatient operating rooms and in emergency rooms by billing the same patient for the initial ventilation setup fee in the emergency room and then billing again for the initial setup fee and a subsequent day of treatment in its outpatient operating rooms, which is not permitted under CMS billing regulations.

### a.    Defendants Double Billed for Emergency Room and Operating Room Ventilation Set Ups.

148.    When a patient is admitted to the emergency room and a ventilation system is set up, the patient may only be charged a bundled Emergency Room evaluation and management fee, which includes the charge for the ventilation system. Similarly, when a patient is admitted to the operating room for an outpatient procedure and a ventilation system is set up the patient may only be charged the bundled anesthesia charge for the Operating Room, which includes the charge for the ventilation set up.  In neither instance may the patient be charged a separate initial ventilation setup fee.

149.    The separate initial ventilation set up, CPT code, 94002, may not be billed where the patient is only seen in the Emergency Room or the Operating Room – in which cases only the bundled codes may be used.  The separate code may only be billed where the patient is admitted as an observational stay or to an inpatient status.[11]

---

[11] Where ventilation systems are set up and used for observational stays and admitted hospital patients, CPT code 94002, which captures a charge both for the setup and the first day of management, is proper. CPT code 94003 may only be used to bill the 2nd day of ventilation management for inpatients.

150.    For example, where a patient receives outpatient surgery and a ventilation system is set up as part of the anesthesia preparation, the initial ventilation setup in the outpatient operating room must be billed in a bundled code as part of the anesthesia procedure.  For non-admitted emergency room and operating room patients, the hospital may not bill separately for ventilation set up. To do so constitutes double billing.

151.    In September 2009, Relator discovered that HCA was overbilling for ventilation set ups in its operating rooms at Oak Hill Hospital.[12]  Relator discovered that HCA's Emergency Rooms and Operating Rooms were improperly charging separate fees for initial ventilation setups for patients who were never admitted to the hospital because they were only admitted to the Emergency Room. Accordingly, the ventilation set up for those patients is incorporated into the bundled emergency room charge, and to separate bill for ventilation set up would constitute double billing.

152.    When Relator was promoted and began reviewing bills from other Florida hospitals, she noticed that this overbilling problem was occurring across Florida.

153.    HCA hospitals knowingly improperly bill outpatients using the separate "94002" code for patients who receive ventilation set ups in the ER and in the OR in addition to billing for ventilation set up using the bundled code, causing the set up to be billed twice.

> **b.    Defendants Double Billed for Subsequent Day Ventilation Management.**

154.    Defendants are also overbilling for ventilation set ups for admitted patients. Healthcare providers also may not bill the outpatient for both an "initial day" set up fee (CPT 94002) and a "subsequent day" management fee (CPT 94003) for a single day of ventilation.

---

[12] CPT codes 94002 and 94003 fall under the Pulmonary, Ventilator Management section. 94002 is for the initial setup and 94003 is the code for subsequent charges by the day.

155.    In a separate but related discovery at Oak Hill Hospital in 2009, Relator found that HCA was incorrectly billing admitted patients for both the "initial day" ventilation set up fee and the "subsequent day" ventilation management fee for a single day of ventilation.

### c.    Defendants Knowingly Double Billed the Government and Failed to Take Sufficient Corrective Action.

156.    Relator has reported all overbilling schemes related to ventilation setup to the Defendants, both to the facility directors where the overbilling has occurred, and to her immediate supervisors at HCA and Parallon.

157.    Eventually, after Relator expressed her concerns, Defendants entered an Edit into the billing system to capture simultaneous ventilation set up and subsequent day billing. However, Defendants have never fully or adequately audited and corrected past overbilling for these patients. Defendants also have not created an edit to prevent Emergency Room and Operating Room overbilling, nor have they performed a comprehensive audit to identify and correct past overbilling.

158.    In failing to sufficiently audit and correct past overbilling for ventilation set ups, Defendants have wrongfully retained payments made by the Government-sponsored Insurance Programs for improper ventilation charges.

159.    Relator has provided the Government with examples of false billing related to ventilation setup and related fees at HCA hospitals, including billing that demonstrates over charging of Government-sponsored and private healthcare programs. Such disclosure was made in furtherance of this action and is protected activity under the Federal False Claims Act and the Qui Tam State analogues.

### 5.    Example No. 5: Overbilling Related to Infusion Stop Times.

160.    IV infusions are common procedures utilized for many reasons, including to deliver medications, such as antibiotics and chemotherapy. These infusions are billed according to the amount of time they take to administer. Some infusions may be relatively short and take only a few minutes, while others may take several hours to complete.

161.    The infusion start and stop times must be documented in the medical record in order to properly bill for these timed services.  Where the infusion stop time is properly recorded, the provider may bill for the first hour and for each subsequent hour the IV infusion is administered. If an infusion stop time is not recorded in the medical record, then the hospital may only bill the infusion – regardless of length - as a 15-minute injection/IV push.

162.    The infusion stop and start times are recorded in a patient's electronic medical record.[13] Revenue integrity nurses review the electronic medical record to determine whether the entered charge matches the recorded stop and start times for the infusion.

163.    In her review of HCA's hospital billing records, Relator discovered that Defendants' agents and employees were routinely failing to record infusion stop times but still billing Medicare for costly hourly infusions.  Because the stop times were not recorded, it is impossible to verify the accuracy of the charges, and Medicare should have only been billed for the minimal 15 minute injection/IV push charge.

---

[13] The infusion stop times must be recorded within the electronic medical record system ("eMAR"). The eMAR system enables hospitals to administer medications in a real-time, fully-integrated electronic documentation system. Within the eMAR, Defendants utilize an electronic document management system referred to as the Horizon Patient Folder (HPF). The start and stop times for IV infusions are typically entered by the nurse in the HPF via the Media-Tech system.  In order to determine if an infusion has been overbilled, one must search the eMAR in HPF or Media-Tech to determine if the nurse (or other authorized medical professional) entered the correct start and stop times.

164.    Relator first learned that HCA was overbilling for IV infusions in 2009, when she discovered that Oak Hill Hospital was not recording or documenting stop times on its medical records.

165.    When Relator was promoted to Lead Revenue Integrity Nurse, she determined that the infusion stop time issue was not isolated to Oak Hill, but was occurring in all twenty-two hospitals that she oversaw.

166.    While Relator attempted to correct the overbilling problem both at Oak Hill and when she became the team leader, her efforts met with only limited success because Defendants failed to correct past overbilling and failed to implement appropriate safeguards against future overbilling.

167.    HCA's facilities placed tens of thousands of patients in observation status and a high percentage of those patients received infusions that were billed improperly.[14]

168.    Relator has provided the Government with examples of false billing related to infusions at HCA hospitals. Such disclosure was made in furtherance of this action and is protected activity under the Federal False Claims Act and the Qui Tam State analogues.

           **a.**      ***Defendants knowingly Overbilled the Government for Improperly Documented Stop Times and Failed to Take Sufficient Corrective Action.***

169.    Approximately four years ago, when Relator discovered that HCA was billing for hourly infusions where infusion stop times were not recorded at Oak Hill Hospital, she reported the improper billing to Oak Hill Surgery Department Director, Ms. Brenda Cavonia, Oak Hill Surgery Department Coordinator, Ms. Phyllis Luccarelli, and Oak Hill Chief Financial Officer,

---

[14] Observation status provides an opportunity for the doctor to decide if a patient needs to be admitted as an inpatient or can be discharged. Observation services may be given in the Emergency Department or other area of a hospital.

Mr. Chance Phillips. She was informed that the infusion overbilling was a "known issue" at HCA.

170.    After reporting the activity, Relator attended several meetings about the overbilling, provided guidance on how infusion times could be easily recorded into the electronic medical record and offered to put a corrective action plan in place that would eliminate the problem.

171.    Relator's suggestions on how to accurately record start and stop times for infusions were ignored by her superiors. Ms. Cavonis and Ms. Lucarelli dismissed Relator's plan. They indicated that they would develop a documentation system, but provided no specifics to Relator.

172.    Defendants flatly rejected Relator's other suggested remedial measures, including changing the infusion codes to injection codes on all past overbills and stated that implementing such a change would be too time consuming.

173.    Defendants' employees further stated that such a change would make it appear that they needed less staff than they did, by minimizing the apparent complexity of the provided service and the apparent time needed to care for patients, which would ultimately adversely affect the department's future staffing levels and revenue streams because with fewer staff, they would not be able to perform and bill for as many patient services.

174.    Despite Relator's efforts, her superiors and Defendants never implemented sufficient corrective measures to address the issue of recording accurate start/stop times.

175.    Eventually, in July 2009, HCA provided the following guidance to its facilities on the documentation process for charting ending/discontinuation times for all IV infusions:

> *The start and stop time of IV medication administrations must be accurately documented for all outpatient IV medications given via*

*infusion. This ensures optimally charging and receipt of payment for the correct duration of infusion. In order for an IV infusion to be coded and billed appropriately, both the time the infusion began and the time it ended must be indicated in the nursing documentation. Coding rules require short infusions lasting 15 minutes or less to bill as an IV push. Without documentation of a stop time, outpatient IV infusions may have to be billed as an IV push.*

176.    In spite of this guidance, Defendants did not perform a comprehensive audit or refunding of past overbills and the overbilling persisted. Relator also observed resistance to correcting this issue and enforcing compliance with the recommended guidelines.

177.    Defendants also have failed to implement an Edit to catch failure to record infusion stop times in the electronic billing system, so improperly billed IV infusions are typically only reviewed when they happen to occur on the same bill as another error for which there is an Edit.

178.    Eventually, Relator's findings were escalated to REGS, HCA's Regulatory Compliance Support section in Nashville, Tennessee. HCA's review determined that the overbilling for infusions was not isolated to facilities in Florida, but was "system-wide," or nationwide.

179.    Defendants know that their 2009 written guidance regarding infusion stop time billing was ineffective because a recent OPPS audit from a single Florida hospital, which considered only a few months of bills, uncovered approximately sixty infusion related billing errors.

180.    Even though the 2012 limited OPPS audit showed that Defendants were routinely failing to record infusion stop times, Defendants continue to overbill Medicare for these services. Despite Relator's notification, and the results of Defendants' narrow audit, Defendants have not

self-reported the overbilling to CMS or returned any overbilled payments as required by 42 U.S.C.A. § 1320a-7k.

181.    While Defendants provided its staff with instructions on how to record the start and stop time for infusions within the electronic record, it knows the instructions are not being followed and has not taken reasonable action to make sure these times are recorded.

182.    Defendants' lack of proper documentation for patient's receiving infusion therapy makes it impossible for them to prove either the duration or extent of the services, and therefore Government-sponsored Insurance Programs should have been charged the minimum allowable amount.

183.    To date, Defendants have failed to repay the Government for the overbilling caused by the use improper and inaccurate infusion stop-times.

184.    Relator has provided the Government with multiple examples of false billing related to infusions at HCA hospitals, including billing that demonstrates over charging of Government-sponsored and private healthcare programs using improper or inaccurate infusion stop-times. Such disclosure was made in furtherance of this action and is protected activity under the Federal False Claims Act and the Qui Tam State analogues.

**6.    Example No. 6: Performing and Billing for Cholesterol Testing not Ordered by a Physician.**

185.    Relator has specific knowledge that HCA established an improper pattern and practice of automatically performing low-density lipoprotein ("LDL") tests, the specific test for "bad cholesterol," every time a doctor orders a generic Lipid Panel to be performed.

186.    When a doctor orders a Lipid Panel, the doctor is ordering that a specific set of tests be performed.  This set of tests does not include an LDL test, which is a separate test and

must be separately ordered.  Accordingly, the combined billing code for the Lipid Panel does not include the LDL test.

187.    Nevertheless, HCA protocol dictates that whenever a doctor orders a standard Lipid Panel test, an LDL test will also always be performed and billed for, even though it was not ordered by the doctor. This non-ordered LDL test is performed without a specific patient-identified need.

188.    In order for any laboratory test to be properly billed to a Government-sponsored Insurance Program under CMS guidelines, there must be a specific medical need for the test, and that need must be documented in the patient's medical record.

189.    To perform and bill for a test which does not have a specifically defined healthcare need is a violation of CMS billing regulations.[15]  While Defendants pay lip service to these requirements, they do nothing to enforce them and encourage staff to disregard them.

190.    Whenever a physician ordered that a patient receive a "Lipid Panel," that order requires a specific series of blood tests be performed on the patient.[16] The tests, if properly ordered and billed under the correct, bundled Lipid Panel charge (CPT 80061), do not include any routine screening for LDL cholesterol.

191.    If the ordered Lipid Panel test results are abnormal, a specific patient need may be identified and further evaluation may be warranted. Only then, after demonstration of a specific need and a specific order by the physician, may the LDL be ordered under CMS regulations. An LDL test is billed using a separate and distinct code, CPT 83721.

---

[15] CMS National Coverage Guideline 190.27 – Lipid Testing: "routine screening and prophylactic testing for lipid disorder are not covered by Medicare. While lipid screening may be medically appropriate, Medicare by statute does not pay for it. Lipid testing in asymptomatic individuals is considered to be screening regardless of the presence of other risk factors such as family history, tobacco use, etc."

[16] Lipid panel or Lipid profile is a panel of blood tests that serves as an initial broad medical screening tool for abnormalities in lipids, such as cholesterol and triglycerides. The bundled Lipid panel charge includes bundled charges for tests corresponding with CPT codes 82465, 83718, and 84478.

192.    In hospitals owned, operated, or managed by Defendants, whenever a doctor orders a Lipid Panel, the laboratories also automatically improperly order an LDL cholesterol test, even though the test has not been specifically ordered or required by a previous abnormal Lipid Panel test.

193.    The recoverable charge, from the Government, for a standard Lipid Panel test is $19, but by adding the LDL cholesterol test to each Lipid Panel, Defendants are able to bill, and receive, an additional $13 for every improperly included LDL cholesterol test.

194.    In July 2011, Relator discovered that Defendants were routinely ordering LDL tests with every Lipid Panel. Relator has since learned that adding an LDL test was a nationwide protocol for Defendants.

195.    While Defendants' billing review system contains an "Edit" to flag any bills where both a Lipid Panel Test and LDL test are charged, the Revenue Integrity nurses and analyst have been instructed to disregard these flagged bills. HCA hospitals have routinely overridden the Edit system to process payments on the improper charges.

196.    Revenue Integrity Director Ginger Foley further told the Revenue Integrity Team "not to look for" orders authorizing the tests, stating that the issues would be caught in routine audits. The "routine" audits referred to by Ms. Foley review only small samplings of bills and do not target known issues.

197.    Despite the fact that, in August 2011, Defendants' Regulatory Compliance Department issued guidance that clearly stated that a facility can only bill for those tests that have a specifically defined healthcare need documented in the medical record (discussed above), Defendants have not conducted any audit to discover the magnitude of the billing errors and has

not returned to the Government any wrongfully received payments derived from unwarranted and improper LDL testing.

198.    Furthermore, Defendants have not taken reasonable measures to prevent future overbilling for unnecessary Lipid Panel testing and has specifically disregarded past measures put in place to address the issue.

199.    In doing so, Defendants have deliberately chosen to ignore government regulations, and their own stated policy, by directing their staff not to verify laboratory tests but, rather, to add a modifier, known as "Modifier 59," to the cost code (CPT) in order to override the Edit for the patient bill to be processed without further scrutiny.

200.    Relator knows that Revenue Integrity Nurses disregard the need to confirm the specific need for the LDL test, as well as the requisite related doctors' orders, and use Modifier 59 as instructed by the Defendants to process the billing.

201.    Despite her resistance, Relator and her staff were told to continue to add the modifiers for laboratory tests that were not ordered by a doctor in the medical record, so that the non-ordered tests would be billed resulting in improper payment by the Government-sponsored Insurance Programs. This conduct continues unabated today. Relator has provided the Government with multiple examples of false billing related to improperly billed routine LDL tests, including billing that demonstrates over charging of Government-sponsored health care programs. Such disclosure was made in furtherance of this action and is protected activity under the Federal False Claims Act and the Qui Tam State analogues.

202.    Through all of the above stated actions and omissions, Defendants have overbilled the Government-sponsored Insurance Programs, have failed to perform sufficient audits to determine the extent of known overbilling, and have failed to remit known overpayments to the

Government.  These actions and omissions constitute violations of the Federal False Claims Act and State Qui Tam Statutes.

## V.    BACKGROUND OF THE REGULATORY FRAMEWORK.

### A.    The Federal Medicare Program.

203.    Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, et seq., establishes the Health Insurance for the Aged and Disabled Program, popularly known as the Medicare program. The Medicare program is comprised of two parts. Part A provides basic insurance for the costs of hospitalization and post-hospitalization care. 42 U.S.C. §§ 1395c-1395i-2(1992). Part B is a 100% federally-subsidized, voluntary insurance program that covers a percentage of the fee schedule for physician services as well as a variety of medical and other services to treat or prevent medical conditions. 42 U.S.C. §§ 1395j-1395w-5. The allegations herein involve both Parts A and B for services billed by the Defendants to Medicare.

204.    The United States provides reimbursement for Medicare Claims from the Medicare Trust Fund through the Centers for Medicare & Medicaid Services ("CMS"), which administers the Medicare program.

205.    CMS contracts with private companies, referred to as "fiscal intermediaries," to administer and pay claims from the Medicare Trust Fund. 42 U.S.C. §1395 (u). In this capacity, the fiscal intermediaries act on behalf of CMS. 42 C.F.R. § 413.64. Under their contracts with CMS, fiscal intermediaries review, approve, and process the payment of Part B claims to providers such as Defendants on behalf of CMS. Those claims are paid with federal funds.

206.    Under Medicare Part A, hospitals enter into an agreement with Medicare to provide healthcare items and services to treat Medicare patients. The hospital, also called a

"provider," is authorized to bill Medicare for that treatment. Most hospitals, including HCA's hospitals, derive a substantial portion of their revenue from the Medicare Program.

207.    HCA, as a Medicare provider, claims Medicare Part B reimbursement from its carriers pursuant to written provider agreements, and those carriers receive, process, and pay or reject claims according to Medicare rules, regulations and procedures.

208.    In order to get paid, a hospital completes and submits a claim for payment on a designated claim form, which, during the relevant time period, was or has been designated either as a Form UB-4 (also known as a CMS-1450) or a Form UB-92. This form contains patient-specific information including the diagnosis and types of services that are assigned or provided to the Medicare patient. The Medicare Program relies upon the accuracy and truthfulness of the UB-4/UB-92 to determine whether and what amounts the hospital is owed.

209.    In addition, at the end of each fiscal year, CMS requires hospitals to submit a Form 2552, more commonly known as the Hospital Cost Report, to the fiscal intermediary. The Hospital Cost Report contains information on facility characteristics, utilization data, costs, Medicare settlement data, financial statement data, and cost and charges by cost center. 42 C.F.R. § 413.20(b), 42 U.S.C. § 1395g. The information reported in the Hospital Cost Report is materially relied upon by CMS when issuing payments for healthcare services provided to Medicare patients

210.    Specifically, while Medicare payments for inpatient hospital services are determined by the claims submitted by the provider for particular patient discharges (specifically listed on UB-4s/UB-92s) during the course of the fiscal year, this Medicare liability for inpatient services is then totaled with any other Medicare liabilities to the provider and is reported on the annual Hospital Cost Report. This total determines Medicare's liability for services rendered to

Medicare beneficiaries during the course of a fiscal year. From this sum, the payments made to the provider during the year are subtracted to determine the amount due to either the Medicare Program or the provider.

211. Medicare relies on the Hospital Cost Report to determine whether the provider is entitled to more reimbursement than the provider has already received through interim payments, or whether the provider has been overpaid and must reimburse Medicare. 42 C.F.R. §§ 405.1803, 413.60, and 413.64(0)(1).

212. A key purpose of the Hospital Cost Reports is to protect the federal Government from loss due to mistake or fraud. Medicare has the right to audit Hospital Cost Reports and financial representations made by program participants to ensure their accuracy and preserve the integrity of the Medicare Trust Funds. However, while Hospital Cost Reports are potentially subject to audit review, it is generally known throughout the healthcare industry that fiscal intermediaries do not have sufficient resources to perform in-depth audits on the majority of Hospital Cost Reports submitted to them. It is also generally known through the healthcare industry that two to three years will elapse from the time Hospital Cost Reports are filed until they are finalized. For these reasons, the cost reporting system relies substantially on the good faith of providers to prepare and file accurate Hospital Cost Reports.

213. To this end, the Hospital Cost Report, Form 2552, contains the following warning:

> MISREPRESENTATION OR FALSIFICATION OF ANY INFORMATION CONTAINED IN THIS COST REPORT MAY BE PUNISHABLE BY CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINE AND/OR IMPRISONMENT UNDER FEDERAL LAW. FURTHERMORE, IF SERVICES IDENTIFIED IN THIS REPORT WERE PROVIDED OR PROCURED THROUGH THE PAYMENT DIRECTLY OR INDIRECTLY OF A KICKBACK OR WERE OTHERWISE ILLEGAL, CRIMINAL, CIVIL AND

ADMINISTRATIVE ACTION, FINES AND/OR IMPRISONMENT MAY RESULT.

214.    This advisory statement is then followed by the following "Certification," which must be signed by the chief administrator of the provider or a responsible designee of the administrator:

> CERTIFICATION BY OFFICER OR ADMINISTRATOR OF PROVIDER(S):
> I HEREBY CERTIFY that I have read the above statement and that I have examined the accompanying electronically filed or manually submitted cost report and the Balance Sheet and Statement of Revenue and Expenses prepared by [name of facility, ID number of facility] for the cost reporting period beginning [date] and ending [date] and that to the best of my knowledge and belief, it is a true, correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted. I further certify that I am familiar with the laws and regulations regarding the provision of the health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.

215.    In order to get paid from Medicare, providers, like Defendants herein, complete and submit a claim for payment on a designated Health Insurance Claim Form, which, during the relevant time period, was or has been designated CMS 1500. This form contains patient-specific information including the diagnosis and types of services that are assigned or provided to the Medicare patient. The Medicare Program relies upon the accuracy and truthfulness of the CMS 1500 to determine whether and what amounts the provider is owed.

216.    The Health Insurance Claim Form, CMS 1500, contains the following certification by the physician or supplier submitting a claim to Medicare:

> I certify that the services shown on this form were medically indicated and necessary for the health of the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision, except as otherwise expressly permitted by Medicare or CHAMPUS regulations.

That certification is then followed by the following "Notice:"

Anyone who misrepresents or falsifies essential information to receive payment from Federal funds requested by this form may upon conviction be subject to fine and imprisonment under applicable Federal laws.

217.    To participate in the Medicare Program, a healthcare provider must also file a provider agreement with the Secretary of the United States Department of Health & Humans Services ("HHS"). 42 U.S.C. § 1395cc. The provider agreement requires compliance with certain requirements that the Secretary deems necessary for participating in the Medicare Program and for receiving reimbursement from Medicare. In order to be eligible for reimbursement under Medicare, medical services must be billed in accordance with the code-based billing structure set forth by CMS, as discussed in greater detail below.

218.    One such important requirement for participating in the Medicare Program is that for all claims submitted to Medicare, claims may be submitted only when medical goods and services are (1) shown to be medically necessary, and (2) are supported by necessary and accurate information. 42 U.S.C. § 1395y(a)(1)(A),(B); 42 C.F.R., Part 483, Subpart B; 42 C.F.R. § 489.20.

219.    Various claims forms, including but not limited to the Hospital Cost Report and the Health Insurance Claim Form, require that the provider certify that the medical care or services rendered were medically "required," medically indicated and necessary and that the provider is in compliance with all applicable Medicare laws and regulations. 42 U.S.C. § 1395n(a)(2); 42 U.S.C. § 1320c-5(a); 42 C.F.R §§ 411.400, 411.406. Providers must also certify that the information submitted is correct and supported by documentation and treatment records. *Id. See also*, 42 U.S.C. § 1320c-5(a); 42 C.F.R. § 424.24.

220.    The practice of billing goods or services to Medicare and other federal healthcare programs that are not medically necessary is known as "overutilization."

221.    As another condition to participation in the Medicare Program, providers are *affirmatively required* to disclose to their fiscal intermediaries any inaccuracies of which they become aware in their claims for Medicare reimbursement (including in their cost reports). 42 C.F.R. §§ 401.601(d)(iii), 411.353(d); 42 C.F.R. Part 405, Subpart C (emphasis added). See also 42 C.F.R. §§ 489.40, 489.31. In fact, under 42 U.S.C. § 1320a-7b(a)(3), providers have a clear, statutorily-created duty to disclose any known overpayments or billing errors to the Medicare carrier, and the failure to do so is a felony. Providers' contracts with CMS carriers or fiscal intermediaries also require providers to refund overpayments. 42 U.S.C. § 1395u; 42 C.F.R. § 489.20(g).

222.    Accordingly, if CMS pays a claim for medical goods or services that were not medically necessary, a refund is due and a debt is created in favor of CMS. 42 U.S.C. § 1395u(l)(3). In such cases, the overpayment is subject to recoupment. 42 U.S.C. § 1395gg. CMS is entitled to collect interest on overpayments. 42 U.S.C. § 1395l(j).

223.    A hospital that participates in the Medicare Program "must have an organized medical staff that operates under bylaws approved by the governing body and is responsible for the quality of medical care provided to patients by the hospital."  42 C.F.R. § 482.22. Hospitals must "develop, implement, and maintain an effective, ongoing, hospital-wide, data-driven quality assessment and performance improvement ['QAPI'] program."  42 C.F.R. § 482.21.

224.    As part of its QAPI program, a hospital "must set priorities for its performance improvement activities that (i) focus on high-risk, high-volume, or problem-prone areas; (ii) consider the incidence, prevalence, and severity of problems in those areas; and (iii) affect health outcomes, patient safety, and quality of care."  Id. § 482.21(c)(1).

225.    A hospital "must track medical errors and adverse patient events, analyze their causes, and implement preventive actions and mechanisms[.]"  Id. § 482.21(c)(2).

**B.    The Federal & State Medicaid Program.**

226.    The Medicaid Program, as enacted under Title XIX of the Social Security Act of 1965, 42 U.S.C. § 1396, et seq., is a system of medical assistance for indigent individuals. Medicaid is a cooperative venture jointly funded by the federal and state governments to assist states in furnishing assistance to eligible persons.

227.    HHS is an agency of the United States and is responsible for the administration, supervision and funding of the federal Medicaid Program. CMS is directly responsible for administering the federal Medicaid Program.

228.    CMS administers Medicaid on the federal level, and reimbursement of hospital costs or charges is governed by Part A of Medicare, through the Hospital Cost Report system, and reimbursement of physician charges is governed by Part B of Medicare. As with the Medicare Program, hospitals and physicians may, through the submission of cost reports and health insurance claim forms, recover costs and charges arising out of the provision of appropriate and necessary care to Medicaid beneficiaries.

229.    Each state, within broad national guidelines established by federal statutes, regulations and policies; (1) establishes its own eligibility standards; (2) determines the type, amount, duration and scope of services; (3) sets the payment for services; and (4) administers its own program.

230.    States have broad discretion in determining which groups their Medicaid programs will cover and the financial criteria for Medicaid eligibility. In order to be eligible for

federal funds, however, a state must provide Medicaid coverage to certain individuals who receive federally-assisted income-maintenance payments.

231.    The federal portion of a state's Medicaid payments-known as the Federal Medical Assistance Percentage (FMAP), is calculated by comparing the state's per capita income to the national average.

232.    As with Medicare, in order for medical services provided to Medicaid patients to be eligible for reimbursement, the services must be billed according to CMS guidelines.

**C.    The Department of Defense TRICARE Program.**

233.    Through the TRICARE program (formerly known as CHAMPUS), the Department of Defense provides healthcare benefits to eligible beneficiaries, which include, among others, active duty service members, retired service members, and their dependents. See 10 U.S.C. §§ 1071-1110, 32 C.F.R. §§ 199.17 and 199.21.

234.    Although TRICARE is administered by the Secretary of Defense, the regulatory authority establishing the TRICARE program provides reimbursement to individual healthcare providers applying the same reimbursement requirements and coding parameters that the Medicare program applies. 10 U.S.C. §§ 1079(j)(2) (institutional providers), (h)(1) (individual healthcare professionals) (citing 42 U.S.C. § 1395, et seq.).

235.    Like Medicare and Medicaid, TRICARE will pay only for "medically necessary services and supplies required in the diagnosis and treatment of illness or injury." 32 C.F.R. § 199.4(a)(1)(i).

236.    Similarly, TRICARE prohibits practices such as submitting claims for services that are not medically necessary, consistently furnishing medical services that do not meet

accepted standards of care, and failing to maintain adequate medical records. 32 C.F.R. §§ 199.9(b)(3)-(b)(5).

## VI.    APPLICATION OF THE FEDERAL FALSE CLAIMS ACT AND THE QUI TAM STATE STATUTES.

237.    The FCA provides liability for any person who conspires to, and/or knowingly or recklessly or in deliberate ignorance of the truth or falsity of the claim, submits a false claim to the Government, or causes another to submit a false claim, or knowingly makes a false record or statement material to a false or fraudulent claim, for payment by the Government. 31 U.S.C. § 3729(a)(1)(A) and (B)

238.    The FCA also provides liability for any person or entity who conspires to, and/or knowingly or recklessly, makes, uses, or causes to be made or used, false records and statements material to obligations to pay or transmit money to the Government, or knowingly concealed, improperly avoided, or decreases an obligation to pay money to the United States Government that was improperly or fraudulently received or retained. 31 U.S.C. § 3729(a)(1)(G)

239.    As described in detail in ¶¶ 26-249**, infra, the conduct of the Defendants falls within the scope purview of the federal False Claims Act and State analogues.

240.    Specifically:

    a.    Defendants, through their revenue integrity and medical billing system, have submitted and caused to be submitted, false claims for payment to the Federal and Qui Tam State Governments.

    b.    Defendants' pattern and practice of failing to audit, or inadequately auditing, their medical billing for errors, falsities or overpayments, resulted in the Defendants submitting or causing to be submitted false claims for payment to the Federal and Qui Tam State Governments, as

well as, wrongfully retain overpayments for false and inaccurate medical billing from said Governments

c.    Defendants' submissions of billing containing "stacked" IV infusion therapy codes represent and resulted in false claims for payment within the meaning of the False Claims Act and State Analogues. Defendants have received wrongfully retained overpayments resulting from these false claims.

d.    Defendants' routine practice of double billing for fluoroscopies in their facilities by separately billing for a service that was already or simultaneously billed for as part of a combined bill with other procedures represents and resulted in false claims for payment within the meaning of the False Claims Act and State Analogues. Defendants have received and wrongfully retained overpayments resulting from these false claims.

e.    Defendants' routine practice of billing for the initial ventilation setup fee in its emergency rooms and then billing for the initial setup fee and a subsequent day of treatment in its outpatient operating rooms represents and resulted in false claims within the meaning of the False Claims Act and State Analogues. Defendants have received and wrongfully retained overpayments resulting from these false claims.

f.    Defendants' practice of routinely failing to record infusion stop times and improperly billing for hourly infusions only minimal injection/IV push charge should have been billed represents and resulted in false claims within the meaning of the False Claims Act and State Analogues.

Defendants have received and wrongfully retained overpayments resulting from these false claims.

g.      Defendants' standing protocol that dictates that the LDL testing always be performed, and billed, without any specific patient-identified need, whenever a doctor orders a standard Lipid Panel test, represents and resulted in false claims within the meaning of the False Claims Act and State Analogues. Defendants have received and wrongfully retained overpayments resulting from these false claims.

h.      Defendants' utilization of the "Plus System" that results in the use of multiple CPT codes that are billed for a group of procedures that are covered by a single comprehensive code, known as "unbundling," resulted in the Defendants submitting or causing to be submitted false claims for payment to the Federal and Qui Tam State Governments., as well as, wrongfully retain overpayments for false and inaccurate medical billing from said Governments.

241.    Defendants and their agents and employees knew or should have known that the medical billing that they submitted to the Government-sponsored Insurance Programs, and, at the very least, acted with deliberate ignorance and reckless disregard for the truth or falsity of the information they conveyed in order to obtain payments on medical billing.

242.    The inaccurate and false information contained in the medical billing forms submitted by Defendants was material to the Government-sponsored Insurance Programs' decisions to remit payment for the billing.

243.     Similarly, the information pertaining to the false billing practices of Defendants that was omitted in its hospital cost reports, other regulatory compliance reporting, disclosed audits, QUAPI reporting, or other disclosures, was material to the Government-sponsored Insurance Programs' determination of Defendants' eligibility to bill and receive payments under those programs.

244.     The Government-sponsored Insurance Programs, unaware of the falsity of the records, statements, and claims made or submitted by Defendants, paid and continue to pay claims that would not be paid if the truth were known.

245.     The Government-sponsored Insurance Programs, unaware of the falsity of the records, statements, and claims made or submitted by Defendants, or of their failure to disclose material facts which would have reduced government obligations, have not recovered the TRICARE, Medicare and Medicaid funds that would have been recovered if otherwise known.

246.     The Defendants actions, including their retention of overpayments, constitute violation of the Federal False Claims Act and *Qui Tam* State statutes.

## VII.   DAMAGES, DISGORGEMENT & REPAYMENT.

247.     The Federal False Claims Act provides for disgorgement, treble damages, and a mandatory civil penalty of not less than $5,500 and not more than $11,000 for each violation of the Act.  *See* 31 U.S.C.A. § 3729(a)(1) and 28 C.F.R § 85.3 (a)(9) (2010).

248.     The *Qui Tam* State statutes provide for similar statutory and compounding civil penalties and damages as specifically set forth and prayed for below.

249.     The federal and *Qui Tam* State governments have sustained significant damages in the form of the depletion of the Federal and State Treasuries of millions of dollars. The money improperly or fraudulently obtained or retained by Defendants represent Government funds that

would have otherwise been used to pay for legitimate, necessary, and properly billed healthcare services provided to recipients of government-sponsored healthcare benefits.

## VIII.   THE CAUSES OF ACTION

### COUNT I: VIOLATION OF THE FEDERAL FALSE CLAIMS ACT (31 U.S.C. § 3729(a)(1); 31 U.S.C. § 3729(a)(1)(A)).

250.    Plaintiff/Relator realleges and incorporates by reference the preceding paragraphs of this Complaint as though fully set forth herein.

251.    Through the acts described above, Defendants and their agents and employees, in reckless disregard for or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented or caused to be presented, and are still presenting or causing to be presented, to the United States Government and state governments participating in the TRICARE, Medicare and Medicaid programs, false and fraudulent claims, records, and statements in order to obtain reimbursement for healthcare services that were falsely billed and/or not ordered by physicians and /or not medically necessary, in violation of 31 U.S.C. § 3729(a)(1); 31 U.S.C. § (a)(1)(A).

252.    As a result of Defendants' actions, as set forth above, the United States of America and the state governments participating in the TRICARE, Medicare and Medicaid programs have been, and may continue to be, severely damaged.

### COUNT II: VIOLATION OF THE FEDERAL FALSE CLAIMS ACT (31 U.S.C. § 3729(a)(2); 31 U.S.C. § 3729(a)(1)(B)).

253.    Plaintiff/Relator realleges and incorporates by reference the preceding paragraphs of this Complaint as though fully set forth herein.

254.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly

made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to the payment of false or fraudulent claims, in violation of 31 U.S.C. § 3729(a)(2); 31 U.S.C. § 3729(a)(1)(B).

255.    As a result of Defendants' actions, as set forth above, the United States of America and the state governments participating in the TRICARE, Medicare and Medicaid programs have been, and may continue to be, severely damaged.

## COUNT III: VIOLATION OF THE FEDERAL FALSE CLAIMS ACT (31 U.S.C. § 3729(a)(7); 31 U.S.C. § 3729(a)(1)(G)).

256.    Plaintiff/Relator realleges and incorporates by reference the preceding paragraphs of this Complaint as though fully set forth herein.

257.    Through the acts described above and otherwise, Defendants and their agents and employees knowingly made, used, or caused to be made or used, false records and statements material to obligations to pay or transmit money to the Government, or knowingly concealed, improperly avoided or decrease HCA's obligation to pay money to the United States Government that HCA improperly or fraudulently received. Defendants also failed to disclose to the Government material facts that would have resulted in substantial repayments by them to the federal and state governments in violation of 31 U.S.C. § 3729(a)(1)(G).

258.    Defendants, at all relevant times to this action, had an ongoing legal obligation to report and disclose overpayments to the Government pursuant to 42 C.F.R. §§ 401.601(d)(iii), 411.353(d); 42 C.F.R. Part 405, Subpart C, 42 C.F.R. §§ 489.40, 489.31, 42 U.S.C. § 1320a-7b(a)(3), 42 U.S.C. § 1395u; and 42 C.F.R. § 489.20(g), and failed to do so.

259.    As a result of Defendants' actions, s set forth above, the United States of America and the state governments participating in the TRICARE, Medicare and Medicaid programs have been, and may continue to be, severely damaged.

## COUNT IV: VIOLATION OF FLORIDA FALSE CLAIMS ACT (Fla. Stat. §68.083 et seq.).

260.    Plaintiff/Relator realleges and incorporates by reference the preceding paragraphs of this Complaint as though fully set forth herein.

261.    This is a civil action brought by Relator, on behalf of the State of Florida, against Defendants under the Florida False Claims Act, Fla. Stat. § 68.083(2).

262.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Florida, or its agencies, false or fraudulent claims for payment or approval, in violation of Fla. Stat. § 68.082(2)(a).

263.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Florida, or its agencies, in violation of Fla. Stat. § 68.082(2)(b).

264.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Florida, or its agencies, in violation of Fla. Stat. § 68.082(2)(g).

265.    The State of Florida, or its agencies, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for falsely-billed medical services for recipients of health insurance plans funded by the State of Florida or its agencies.

266.    As a result of Defendants' actions, as set forth above, the State of Florida and/or its agencies have been, and may continue to be, severely damaged.

267.    Based on the foregoing allegations, the Defendants are liable under Fla. Stat. §68.082(2)(g).

## COUNT V: VIOLATION OF CALIFORNIA FALSE CLAIMS ACT (Cal. Gov. §12651 et seq.).

268.    Plaintiff/Relator realleges and incorporates by reference the preceding paragraphs of this Complaint as though fully set forth herein.

269.    This is a civil action brought by Relator, on behalf of the State of California, against Defendants under the California False Claims Act, Cal. Gov't Code § 12652(c).

270.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of Cal. Gov't Code § 12651(a)(1).

271.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of Cal. Gov't Code § 12651(a)(2).

272.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of California, or its political subdivisions, in violation of Cal. Gov't Code § 12651(a)(7).

273.    The State of California, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for falsely-billed medical services for recipients of state and state subdivision funded health insurance programs.

274.    As a result of Defendants' actions, as set forth above, the State of California and/or its political subdivisions have been, and may continue to be, severely damaged.

275.    Based on the foregoing allegations, the Defendants are liable under Cal. Gov. Code §12651(a) et seq.

## COUNT VI: VIOLATION OF COLORADO MEDICAID FALSE CLAIMS ACT (Colo. Rev. Stat. §25.5-4-305 et seq.).

276.    Plaintiff/Relator realleges and incorporates by reference the preceding paragraphs of this Complaint as though fully set forth herein.

277.    This is a civil action brought by Relator, on behalf of the State of Colorado, against Defendants under the Colorado Medicaid False Claims Act, Colo. Rev. Stat. § 25.5-4-306(2).

278.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented, or caused to be presented, and may still be presenting or causing to be presented, to an

officer or employee of the State of Colorado, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Colo. Rev. Stat. § 25.5-4-305(a).

279.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of Colo. Rev. Stat. § 25.5-4-305(b).

280.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Colorado, or its political subdivisions, in violation of Colo. Rev. Stat. § 25.5-4-305(f).

281.    The State of Colorado, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for falsely-billed medical services for recipients of state and state subdivision funded health insurance programs.

282.    As a result of Defendants' actions, as set forth above, the State of Colorado and/or its political subdivisions have been, and may continue to be, severely damaged.

283.    Based on the foregoing allegations, the Defendants are liable under Colo. Rev. Stat. § 25.5-4-305 et seq.

## COUNT VII: VIOLATION OF DISTRICT OF COLUMBIA FALSE CLAIMS ACT (D.C. Code § 2-308 et seq.).

284. Plaintiff/Relator realleges and incorporates by reference the preceding paragraphs of this Complaint as though fully set forth herein.

285. This is a civil action brought by Relator, on behalf of the District of Columbia, against Defendants under the District of Columbia False Claims Act, D.C. Code § 2-308.15(b).

286. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented, or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the District, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of D.C. Code § 2-308.14(a)(1).

287. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be used, and may still be making, using, or causing to be made or used, false records or statements to get false claims paid or approved by the District, or its political subdivisions, in violation of D.C. Code § 2-308.14(a)(2).

288. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the District, or its political subdivisions, in violation of D.C. Code § 2-308.14(a)(7).

289. The District of Columbia, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance upon the accuracy of these

claims and/or statements, paid, and may continue to pay, for falsely-billed medical services for recipients of health insurance programs funded by the District.

290.    As a result of Defendants' actions, as set forth above, the District of Columbia and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT VIII: VIOLATION OF GEORGIA STATE FALSE MEDICAID CLAIMS ACT (Georgia Code, Title 49, Ch. 4, Art. 168 et seq.).

291.    Plaintiff/Relator realleges and incorporates by reference the preceding paragraphs of this Complaint as though fully set forth herein.

292.    This is a civil action brought by Relator, on behalf of the State of Georgia, against Defendants pursuant to the Georgia False Medicaid Claims Act, Ga. Code Ann. § 49-4-168.2(b).

293.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to the Georgia Medicaid program false or fraudulent claims for payment or approval, in violation of Ga. Code Ann. § 49-4-168.1(a)(1).

294.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Georgia Medicaid program, in violation of Ga. Code Ann. § 49-4-168.1(a)(2).

295.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made

or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Georgia, or its political subdivisions, in violation of Ga. Code Ann. § 49-4168.1(a)(7).

296.    The State of Georgia, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for falsely-billed medical services for recipients of Medicaid.

297.    As a result of Defendants' actions, as set forth above, the State of Georgia and/or political subdivisions have been, and may continue to be, severely damaged.

298.    304.    Based on the foregoing allegations, the Defendants are liable under O.C.G.A. § 49-4-168.1(a).

## COUNT IX: VIOLATION OF INDIANA FALSE CLAIMS & WHISTLE-BLOWER PROTECTION ACT (Ind. Code § 5-11-5.5 et seq.).

299.    Plaintiff/Relator realleges and incorporates by reference the preceding paragraphs of this Complaint as though fully set forth herein.

300.    This is a civil action brought by Relator, on behalf of the State of Indiana, against Defendants under the Indiana False Claims and Whistleblower Protection Act, Ind. Code § 5-11-5.5-4(a).

301.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally presented, or caused to be presented, and may still be presenting or causing to be presented, false claims to the State of Indiana, or its political subdivisions, for payment or approval, in violation of Ind. Code § 5-11-5.5-2(b)(1).

302.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to obtain payment or approval of false claims from the State of Indiana, or its political subdivisions, in violation of Ind. Code § 5-11-5.5-2(b)(2).

303.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to avoid an obligation to pay or transmit money to the State of Indiana, or its political subdivisions, in violation of Ind. Code § 5-11-5.52(b)(6).

304.    The State of Indiana, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of those claims and/or statements, paid, and may continue to pay, for falsely-billed medical services for recipients of state funded health insurance programs.

305.    As a result of Defendants' actions, as set forth above, the State of Indiana and/or its political subdivisions have been, and may continue to be, severely damaged.

306.    Based on the foregoing allegations, the Defendants are liable under the Indiana False Claims & Whistleblower Protection Law, Ind. Code § 5-11-5.5.

## COUNT X: VIOLATION OF LOUISIANA MEDICAL ASSISTANCE PROGRAMS INTEGRITY LAW (La. Rev. Stat. § 46:438.3 et seq.).

307.    Plaintiff/Relator realleges and incorporates by reference the preceding paragraphs of this Complaint as though fully set forth herein.

308.    This is a civil action brought by Relator, on behalf of the State of Louisiana's medical assistance programs, against Defendants under the Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann. § 46:439.1.

309.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented, or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims, in violation of La. Rev. Stat. Ann. § 46:438.3(A).

310.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly engaged in misrepresentation, and may still be engaging in misrepresentation, to obtain, or attempt to obtain, payment from medical assistance programs funds, in violation of La. Rev. Stat. Ann. § 46:438.3(B).

311.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly submitted, and may continue to submit, claims for goods, services or supplies which were medically unnecessary or which were of substandard quality or quantity, in violation of La. Rev. Stat. Ann. § 46:438.3(D).

312.    The State of Louisiana, its medical assistance programs, political subdivisions and/or the Department, unaware of the falsity of the claims and/or statements made by Defendants, or their actions as set forth above, acted in reliance, and may continue to act in reliance, on the accuracy of Defendants' claims and/or statements in paying for falsely-billed medical services for medical assistance program recipients.

313.     As a result of Defendants' actions, as set forth above, the State of Louisiana, its medical assistance programs, political subdivisions and/or the Department have been, and may continue to be, severely damaged.

314.     Based on the foregoing allegations, the Defendants are liable under the Louisiana Qui Tam Action Act, La. Rev. Stat. § 46:438.3.

## COUNT XI: VIOLATION OF NEVADA SUBMISSION OF FALSE CLAIMS TO STATE OR LOCAL GOVERNMENT ACT (Nev. Rev. Stat. § 357.040 et seq.).

315.     Plaintiff/Relator realleges and incorporates by reference the preceding paragraphs of this Complaint as though fully set forth herein.

316.     This is a civil action brought by Relator, on behalf of the State of Nevada, against Defendants under the Nevada False Claims Act, Nev. Rev. Stat. § 357.080(1).

317.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false claims for payment or approval, in violation of Nev. Rev. Stat. § 357.040(1)(a).

318.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to obtain payment or approval of false claims, in violation of Nev. Rev. Stat. § 357.040(1)(b).

319.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit

money to the State of Nevada, or its political subdivisions, in violation of Nev. Rev. Stat. § 357.040(1)(g).

320.     The State of Nevada, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for falsely-billed medical services for recipients of health insurance programs funded by the state or its political subdivisions.

321.     As a result of Defendants' actions, as set forth above, the State of Nevada and/or its political subdivisions have been, and may continue to be, severely damaged.

322.     Based on the foregoing allegations, the Defendants are liable under the Nevada Submission of False Claims to State or Local Government Act, Nev. Rev. Stat. § 357.040.

## COUNT XII: VIOLATION OF OKLAHOMA MEDICAID FALSE CLAIMS ACT (63 Okl. Stat. Tit 63, § 5053 et seq.).

323.     Plaintiff/Relator realleges and incorporates by reference the preceding paragraphs of this Complaint as though fully set forth herein.

324.     This is a civil action brought by Relator, on behalf of the State of Oklahoma, against Defendants pursuant to the Oklahoma Medicaid False Claims Act, Okla. Stat. tit. 63, § 5053.2(B)(1).

325.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Oklahoma, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Okla. Stat. tit. 63, § 5053.1(B)(1).

326.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made or caused to be made, and may still be making or causing to be made, false records or statements to get false or fraudulent claims paid or approved by the State of Oklahoma, or its political subdivisions, in violation of Okla. Stat. tit. 63, § 5053.1(B)(2).

327.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Oklahoma, or its political subdivisions, in violation of Okla. Stat. tit. 63, § 5053.1(B)(7).

328.    The State of Oklahoma, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for falsely-billed medical services for recipients of Medicaid.

329.    As a result of Defendants' actions, as set forth above, the State of Oklahoma and/or its political subdivisions have been, and may continue to be, severely damaged.

330.    Based on the foregoing allegations, the Defendants are liable under the Oklahoma Medicaid False Claims Act, 63 Okl. Stat. § 5053.1(2)(B).

## COUNT XIII: VIOLATION OF TENNESSEE MEDICAID FALSE CLAIMS ACT (Tenn. Code Ann. § 71-5-182(a)(1)).

331.    Plaintiff/Relator realleges and incorporates by reference the preceding paragraphs of this Complaint as though fully set forth herein.

332.    This is a civil action brought by Relator, on behalf of the State of Tennessee, against Defendants under the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5183(b).

333.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to the State of Tennessee, or its political subdivisions, false or fraudulent claims for payment under the Medicaid program, in violation of Tenn. Code Ann. § 71-5-182(a)(1)(A).

334.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false or fraudulent records or statements to get false or fraudulent claims under the Medicaid program paid for or approved by the State of Tennessee, or its political subdivisions, in violation of Tenn. Code Ann. § 71-5-182(a)(1)(B).

335.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false or fraudulent records or statements to conceal, avoid or decrease an obligation to pay or transmit money to the State of Tennessee, or its political subdivisions, relative to the Medicaid program, in violation of Tenn. Code Ann. § 71-5-182(a)(1)(D).

336.    The State of Tennessee, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims

and/or statements, paid, and may continue to pay, for prescription falsely-billed medical services for recipients of the Medicaid program.

337.    As a result of Defendants' actions, as set forth above, the State of Tennessee and/or its political subdivisions have been, and may continue to be, severely damaged.

338.    Based on the foregoing allegations, the Defendants are liable under the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-182(a)(1).

## COUNT XIV: TEXAS MEDICAID FRAUD PREVENTION ACT (Tex. Hum. Res. Code § 36.001 et seq.).

339.    Plaintiff/Relator realleges and incorporates by reference the preceding paragraphs of this Complaint as though fully set forth herein.

340.    This is a civil action brought by Relator, on behalf of the State of Texas against, Defendants under the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code Ann. § 36.101(a).

341.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made or caused to be made, and may still be making or causing to be made, false statements or misrepresentations of material fact that permitted Defendants to receive a benefit or payment under the Medicaid program that was not authorized or that was greater than the benefit or payment that was authorized, in violation of Tex. Hum. Res. Code Ann. 36.002(1).

342.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly concealed or failed to disclose, or caused to be concealed or not disclosed -- and may still be concealing or failing to disclose, or causing to be concealed or not disclosed -- information that permitted Defendants to receive a benefit or payment under the Medicaid program that was not

authorized or that was greater than the payment that was authorized, in violation of Tex. Hum. Res. Code Ann. § 36.002(2).

343.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, caused to be made, induced or sought to induce, and may still be making, causing to be made, inducing or seeking to induce, false statements or misrepresentations of material fact concerning information required to be provided by a federal or state law, rule, regulation or provider agreement pertaining to the Medicaid program, in violation of Tex. Hum. Res. Code Ann. § 36.002(4)(B).

344.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, and may still be making, claims under the Medicaid program for services or products that were inappropriate, in violation of Tex. Hum. Res. Code Ann. § 36.002(7)(C).

345.    The State of Texas, or it political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for falsely-billed medical services for recipients of Medicaid.

346.    As a result of Defendants' actions, as set forth above, the State of Texas and/or its political subdivisions have been, and may continue to be, severely damaged.

347.    Based on the foregoing allegations, the Defendants are liable under the Texas Hum. Res. Code § 36.002.

## COUNT XV: VIOLATION OF VIRGINIA FRAUD AGAINST TAXPAYERS ACT (Va. Code Ann. § 216 et seq.).

348.    Plaintiff/Relator realleges and incorporates by reference the preceding paragraphs of this Complaint as though fully set forth herein.

349.    This is a civil action brought by Relator, on behalf of the Commonwealth of Virginia, against Defendants under the Commonwealth of Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.5(A).

350.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the Commonwealth of Virginia, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Va. Code Ann. § 8.01-216.3(A)(1).

351.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Commonwealth of Virginia, or its political subdivisions, in violation of Va. Code Ann. § 8.01216.3(A)(2).

352.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the Commonwealth of Virginia, or its political subdivisions, in violation of Va. Code Ann. § 8.01-216.3(A)(7).

353.    The Commonwealth of Virginia, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance upon the accuracy of these claims and/or statements, paid, and may continue to pay, for falsely-billed medical services for recipients of state funded health insurance programs.

354.    As a result of Defendants' actions, as set forth above, the Commonwealth of Virginia and/or its political subdivisions have been, and may continue to be, severely damaged.

## PRAYER FOR RELIEF.

WHEREFORE, Relator Kelly Oxendine prays for judgment against Defendants as follows:

355.    That Defendants be ordered to cease and desist from submitting or causing to be submitted any more false claims, or further violating 31 U.S.C. § 3729 et seq.; S. 5978 2nd Cong. § et seq.; Cal. Gov't Code § 12650 et seq.; Colo. Rev. Stat. § 25.5-4-304 et seq.; D.C. Code § 2-308.13 et seq.; Fla. Stat. § 68.081 et seq.; Ga. Code Ann. § 49-4-168 et seq.;  Ind. Code § 5-11-5.5 et seq.; La. Rev. Stat. Ann. § 46:437.1 et seq.; Nev. Rev. Stat. § 357.010 et seq.; Okla. Stat. tit. 63, § 5053 et seq.; R.I. Gen. Laws § 9-1.1-1 et seq.; Tenn. Code Ann. § 71-5-181 et seq.; Tex. Hum. Res. Code Ann. § 36.001 et seq.; and Va. Code Ann. § 8.01-216.1 et seq.

356.    That judgment be entered in favor of the United States and Relator against Defendants in the amount of each and every false or fraudulent claim multiplied as provided by 31 U.S.C. §3729(a), plus a civil penalty of not less than Five Thousand Five Hundred and No/100 ($5,500.00) Dollars, and no more than Eleven Thousand and No/100 ($11,000.00) Dollars per claim, as provided by 31 U.S.C. §3729(a), to the extent such multiplied penalties shall fairly compensate the United States of America for losses resulting from the various

schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

357.    That Relator be awarded the maximum amount permissible according to 31 U.S.C. §3730 (d); S. 5978, 2nd Cong. § 207(1); Cal. Gov't Code § 12652(g)(4); Colo. Rev. Stat. § 25.5-4-306(4); D.C. Code § 2-308.15(f); Fla. Stat. § 68.085, Ga. Code Ann. § 49-4-168.2(i); Ind. Code § 5-11-5.5-6; La. Rev. Stat. Ann. § 439.4; Nev. Rev. Stat. § 357.210; Okla. Stat. tit. 63, § 5053.4; Tenn. Code Ann. § 71-5-183(d); Tex. Hum. Res. Code Ann. § 36.110; and Va. Code Ann. § 8.01-216.7, including reasonable attorneys' fees and litigation costs;

358.    That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of California or its political subdivisions multiplied as provided for in Cal. Gov't Code § 12651(a), plus a civil penalty of not less than five thousand dollars ($5,000) per claim or more than ten thousand dollars ($10,000) per claim as provided by Cal. Gov't Code § 12651(a), to the extent such penalties shall fairly compensate the State of California or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

359.    That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Colorado or its political subdivisions multiplied as provided for in Colo. Rev. Stat. § 25.5-4-305(1), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) for each act as provided by Colo. Rev. Stat. § 25.5-4-305(1), to the extent such multiplied penalties shall fairly compensate the State of Colorado or its political subdivisions for losses resulting from the

various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

360.    That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the District of Columbia, multiplied as provided for in D.C. Code § 2-308.14(a), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) for each false claim, and the costs of this civil action brought to recover such penalty and damages, as provided by D.C. Code § 2-308.14(a), to the extent such multiplied penalties shall fairly compensate the District of Columbia for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

361.    That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Florida or its agencies multiplied as provided for in Fla. Stat. § 68.082(2), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) for each false claim as provided by Fla. Stat. Ann. § 68.082(2), to the extent such multiplied penalties shall fairly compensate the State of Florida or its agencies for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

362.    That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Georgia or its political subdivisions multiplied as provided for in Ga. Code Ann. § 49-4-168.1(a), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) per false claim as provided by Ga. Code Ann. § 49-4-168.1(a), to the extent such multiplied penalties shall fairly compensate the State of Georgia or its political subdivisions for losses resulting from the various

schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

363.    That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Indiana, multiplied as provided for in Ind. Code § 5-115.5-2(b), plus a civil penalty of at least five thousand dollars ($5,000) as provided by Ind. Code § 5-11-5.5-2(b), to the extent such penalties shall fairly compensate the State of Indiana for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

364.    That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by Louisiana's medical assistance programs, multiplied as provided for in La. Rev. Stat. Ann. § 46:438.6(B)(2), plus a civil penalty of no more than ten thousand dollars ($10,000) per violation or an amount equal to three times the value of the illegal remuneration, whichever is greater, as provided for by La. Rev. Stat. Ann. § 46:438.6(B)(1), plus up to ten thousand dollars ($10,000) for each false or fraudulent claim, misrepresentation, illegal remuneration, or other prohibited act, as provided by La. Rev. Stat. Ann. § 46:438.6(C)(1)(a), plus payment of interest on the amount of the civil fines imposed pursuant to Subsection B of § 438.6 at the maximum legal rate provided by La. Civil Code Art. 2924 from the date the damage occurred to the date of repayment, as provided by La. Rev. Stat. Ann. § 46:438.6(C)(1)(b), to the extent such multiplied fines and penalties shall fairly compensate the State of Louisiana's medical assistance programs for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

365.    That judgment be entered in Relator's favor and against Defendants for restitution to the State of Nevada for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in Nev. Rev. Stat. § 357.040, multiplied as provided for in Nev. Rev. Stat. § 357.040(1), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) for each act, pursuant to Nev. Rev. Stat. § 357.040(1), to the extent such multiplied penalties shall fairly compensate the State of Nevada for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

366.    That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Oklahoma or its political subdivisions multiplied as provided for in Okla. Stat. tit. 63, § 5053.1(B), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) as provided by Okla. Stat. tit. 63, § 5053.1(B), to the extent such multiplied penalties shall fairly compensate the State of Oklahoma or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

367.    That judgment be entered in Relator's favor and against Defendants for restitution to the State of Tennessee for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in Tenn. Code Ann. § 71-5-182, multiplied as provided in Tenn. Code Ann. § 71-5-182(a)(1), plus a civil penalty of not less than five thousand dollars ($5,000) or more than twenty-five thousand dollars ($25,000) pursuant to Tenn. Code Ann. § 71-5-182(a)(1), to the extent such multiplied penalties shall fairly compensate the

State of Tennessee for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

368.    That judgment be entered in Relator's favor and against Defendants for restitution to the State of Texas for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in Tex. Hum. Res. Code Ann. § 36.052(a), multiplied as provided for in Tex. Hum. Res. Code Ann. § 36.052(a)(4), the interest on the value of such payments or benefits at the prejudgment interest rate in effect on the day the payment or benefit was paid or received, for the period from the date the payment or benefit was paid or received to the date that restitution is made to the State of Texas, pursuant to Tex. Hum. Res. Code Ann. § 36.052(a)(2), plus a civil penalty of not less than five thousand dollars ($5,000) or more than fifteen thousand dollars ($15,000) for each unlawful act committed that resulted in injury to an elderly or disabled person, and of not less than one thousand dollars ($1,000) or more than ten thousand dollars ($10,000) for each unlawful act committed that did not result in injury to an elderly or disabled person, pursuant to Tex. Hum. Res. Code Ann. §§ 36.052(a)(3)(A) and (B), to the extent such multiplied penalties shall fairly compensate the State of Texas for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

369.    That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the Commonwealth of Virginia, multiplied as provided for in Va. Code Ann. § 8.01-216.3(A), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) as provided by Va. Code Ann. § 8.01-216.3(A), to the extent such multiplied penalties shall fairly compensate the Commonwealth of Virginia for losses resulting from the various schemes undertaken by

Defendants, together with penalties for specific claims to be identified at trial after full discovery;

370.     That Defendants be ordered to disgorge all sums by which they have been enriched unjustly by their wrongful conduct;

371.     That judgment be granted for the United States of America and Relator and against Defendants for any costs including, but not limited to, court costs, expert fees, and all reasonable attorneys' fees incurred by Relator in the prosecution of this suit;

372.     That the United States and Relator be granted such other and further relief as the Court deems just and proper.

***JURY TRIAL DEMAND***

Relator demands a trial by jury of all issues so triable.


Dated this 7th day of November, 2013.

                                        Respectfully submitted,

                                        /S/ Robert G. Rikard

                                        Robert G. Rikard, Esq.
                                        Peter D. Protopapas
                                        RIKARD & PROTOPAPAS, LLC
                                        1329 Blanding Street
                                        Columbia, SC 29201
                                        Office: 803-978-611
                                        Fax: 803-978-6112

                                        Peter J. Mougey, Esq.
                                        James L. Kauffman, Esq.
                                        Laura S. Dunning, Esq.
                                        Christopher G. Paulos, Esq.
                                        LEVIN, PAPANTONIO, THOMAS, MITCHELL,
                                        RAFFERTY & PROCTOR, P.A.
                                        316 S. Baylen Street
                                        Pensacola, Florida 32502
                                        Office: 850-435-7067

Fax: 850-436-6066

John A. Yanchunis, Esq.
James Young, Esq.
MORGAN & MORGAN
COMPLEX LITIGATION GROUP
Tampa, Florida 33602
Office: 813-223-5505
Fax: 813-223-5402

Howard S. Merricks, Esq.
Tommy Kinsella, Esq.
MERRICKS LAW GROUP, P.A.
2431 Brunello Trace
Lutz, FL  33558
(813) 226-3800 (Phone)
(813) 948-9631 (Fax)

*Counsel for Plaintiff/Relators*